CRITES, INCORPORATED *v.* PRUDENTIAL INSURANCE CO. ET AL.

No. 317.   Argued March 1, 1944.—Decided May 22, 1944.

*Messrs. Isaac E. Ferguson* and *Joseph Rosenbaum* for petitioner.

*Messrs. Clarence D. Laylin* and *Osmer C. Ingalls* for respondents.

MR. JUSTICE MURPHY delivered the opinion of the Court.

We granted certiorari in this case to determine certain important questions concerning the proper administration of federal receiverships.

Henry M. Crites and his wife, May R. Crites, executed mortgages in 1929 to the Prudential Insurance Company of America upon 22 parcels of adjoining farm property in

Madison and Pickaway Counties, Ohio. Each mortgage, being in default, was matured by acceleration on December 30, 1931. On February 17, 1932, Prudential began 22 separate foreclosure proceedings against the Criteses and Crites, Inc., the petitioner. Only the 11 proceedings relating to the 11 contiguous farms in Madison County, on which the mortgages aggregated $192,000, are now before us.

An involuntary petition in bankruptcy had been filed against Henry M. Crites. Petitioner is an Ohio corporation formed by Crites' creditors in an effort to salvage something from the farms. To it had been conveyed all the properties of the Criteses, including the equities of redemption. Prudential requested that a receiver be appointed to take charge of the mortgaged farms pending the termination of the foreclosure proceedings. The District Court accordingly appointed as co-receivers the respondents Simkins and Florence "to collect the rents and proceeds of the real estate . . . to operate and manage said real estate through tenants, lessees, or otherwise, to rent and lease said real estate, to pay delinquent taxes and assessments and insurance premiums, to make such repairs as may be necessary to preserve the value of the premises and to produce normal income therefrom, and to do such other acts as may be from time to time ordered by the court." Subsequent orders authorized them to borrow money from Prudential and from the local bank to pay necessary expenses relating to the farms and to execute leases of the farms upon a share or crop rental basis.

No answers to the foreclosure complaints were filed. In the hope that economic conditions would improve and bring about a higher sale value, the District Court allowed the receivers to operate the farms for a year before entering decrees *pro confesso* on May 2, 1933. By these decrees the mortgages and equities of redemption were declared foreclosed and the marshal was directed to sell each farm

individually on July 1, 1933, at a public sale for cash at not less than two-thirds of the appraised value. The appraisers set the value of the 11 Madison County farms at $244,080, making $162,720 the minimum price at which they could be sold. The decree indebtedness in the 11 cases was $223,742.32. Prudential made the sole bids at the public sale on July 1 and secured title to the 11 farms for $163,900, slightly more than the upset price. The District Court confirmed this sale on July 18.

Prudential subsequently objected to the allowance of the receivers' claims on the ground that they were excessive. Petitioner also filed objections. Hearings were held before a special master. The District Court overruled petitioner's exceptions to the special master's report and its counterclaim, amended and approved the receivers' accounts, and affirmed the special master's report. Petitioner alone appealed, the court below affirming the action of the District Court with a slight modification as to additional fees for the receivers' attorneys. 134 F. 2d 925.

## I.

Petitioner's first contention is that Simkins' actions in connection with the foreclosure sales constituted a breach of his duty as a receiver and rendered him accountable for certain profits made by him and others.

The evidence indicates that a Col. Proctor of Cincinnati was interested in purchasing the entire 11 Madison County farms as a unit and that he employed a real estate agent, Edwin Jones,[1] to represent him in the matter. Several weeks before the foreclosure sales, Jones visited Simkins and told him that he understood that Simkins was one of the attorneys in the matter and that he was inter-

---

[1] Jones was familiar with the 11 Madison County farms, having made an offer of $500,000 for them "a year or more" prior to 1933 on behalf of a New York principal. Crites rejected this offer, however.

ested in buying the farms. Simkins, in addition to being one of the co-receivers, was an attorney who had represented Prudential in other foreclosure proceedings in Ohio and who had served Jones in a professional capacity on other matters. Simkins replied that "we are in no position to offer it right now, not in position until after the foreclosure proceedings and the Prudential Insurance Company acquires title for it, then they will be in position to offer it to anybody else trying to buy it." Simkins agreed, however, to intercede on Jones' behalf. They then drew up a contract whereby Simkins was to assist Jones in securing title to the 11 farms from Prudential after the latter had secured title by purchase at the public sale. The compensation of Simkins was dependent upon the success of the deal. Simkins did not know at this time the name of Jones' principal or how much the principal was willing to pay for the farms as a unit. Simkins then informed petitioner's counsel and the district judge that there "might be some parties interested" in the 11 farms as a unit, but was informed that they could not be sold as a group. It does not appear that he told counsel or the court that he had accepted employment from Jones.[2]

At Jones' request, Simkins conferred on June 25, 1933, with Prudential representatives concerning the possibility of purchasing the 11 farms from Prudential. No definite arrangements were then made, the representatives stating that they could not discuss terms until Prudential had bought the farms at the sale. On June 27 Jones submitted through Simkins a written offer of $249,106 to Prudential for the 11 farms, including "the company's undivided one-half interest in the growing corn crop thereon." The offer was witnessed by Simkins and another person and was

---

[2] Simkins testified that the fact of his employment by Jones "was no secret" and that "I may have told Judge Hough. I would not have hesitated in telling him."

enclosed in a letter which was addressed to one of Prudential's representatives and which was signed by Simkins. In this letter Simkins vouched for the responsibility of "Mr. Jones' buyer." Jones also enclosed a $3,000 certified check in support of his offer. Simkins by this time clearly was aware of the identity of Jones' principal and of the terms of the offer to Prudential. But he made no effort to inform either the district judge or petitioner of these facts prior to or at the sale.

At the public sale held by the marshal on July 1, Prudential made the sole bids and secured title to the 11 farms for a total sum of $163,900. Jones attended the sale but Col. Proctor had not authorized Jones to bid since he desired to buy only when he could be assured of securing all the 11 farms at once and when title to them was supported by a warranty deed from Prudential. Two days later, on July 3, Prudential accepted Jones' offer of $249,106.

Prudential then moved to confirm the public sales, giving due notice to petitioner of the hearing on the motion. At this hearing on July 18, objections to the motion "were suggested by reason of alleged commitments made by the plaintiff [Prudential] for the sale of certain of said properties, prior to public sale." It does not appear who made these objections or whether the petitioner's counsel was present. Harrison, one of the attorneys for the receivers, thereupon orally advised the judge of the terms and amount of Jones' offer and its acceptance by Prudential. At the judge's suggestion, Harrison set forth these facts in the form of an affidavit, which was later introduced at the hearing on the receivers' accounts. The court was not informed, however, as to Simkins' participation in the matter or as to the fact that Col. Proctor was the actual purchaser of the farms. Simkins was present in the court room at this time but said nothing. The judge confirmed the sales on the same day, July 18. Soon afterwards Prudential executed a warranty deed to Col. Proctor's nom-

inee, the deed reciting a consideration of $249,106 but bearing tax stamps apparently indicating a substantially greater price.[3]

Simkins received a total of $2,797 from Jones, nearly all of which was in payment for his aid in consummating the purchase of the farms from Prudential.

On the basis of these facts, petitioner seeks to have Simkins surcharged with (a) all payments received by him from Jones for his assistance in consummating the resale of the farms to Col. Proctor; (b) the commission or profit received by Jones; and (c) the amount received by Prudential in excess of the decree indebtedness or, in the alternative, the amount by which the appraised value of the farms exceeded the decree indebtedness. Petitioner claims that Simkins must be surcharged with these amounts because he breached his duty as co-receiver by accepting employment from Jones in advance of the foreclosure sales to help bring about a resale of the farms from Prudential to Col. Proctor. Respondents, on the other hand, resist this claim on the ground that Simkins was appointed co-receiver only to collect the rents and to operate the farms and had no fiduciary duty with respect to the foreclosure sales.

It is true that Simkins' official duties as co-receiver were limited to those conferred upon him by the court and that he had no authority to sell or to cause a sale of the farms in question. The foreclosure sales were conducted by the marshal under the direct supervision of the District Court and there was no evidence that Simkins unduly influenced the actual execution of the sales in any way. It

---

[3] Petitioner claims that the stamps indicate that Col. Proctor paid approximately $281,000, "presumably, $249,106 net to Prudential . . . and the difference of $31,894 to Jones." There was no proof, however, that Jones received that amount. He testified merely that he received $15,000 and an additional amount that he did not remember, from which amounts he paid Simkins.

is obvious, moreover, that Simkins was bound to perform his delegated duties with the high degree of care demanded of a trustee or other similar fiduciary. He was not free to deal with the property under his control as co-receiver in such a way as to benefit himself or his associates. Any profits that might have resulted from a breach of these high standards, including the profits of others who knowingly joined him in pursuing an illegal course of action, would have to be disgorged and applied to the estate. *Michoud* v. *Girod,* 4 How. 503; *Magruder* v. *Drury,* 235 U. S. 106; *Jackson* v. *Smith,* 254 U. S. 586.

But Simkins' conduct is not to be measured solely by the arbitrary dichotomy of functions relating to the conservation and liquidation of the farm properties. As a co-receiver in charge of collecting the rents and operating the farms, Simkins was also an officer or arm of the court. He was appointed to assist the court in protecting and preserving, for the benefit of all parties concerned, the properties in the court's custody pending the foreclosure proceedings. *Booth* v. *Clark,* 17 How. 322, 331; *Davis* v. *Gray,* 16 Wall. 203, 217–218; *Stuart* v. *Boulware,* 133 U. S. 78, 81; *Porter* v. *Sabin,* 149 U. S. 473, 479; *Atlantic Trust Co.* v. *Chapman,* 208 U. S. 360, 370–371. The court's authority and duties, however, covered all phases of the foreclosure proceedings. They included not only the conservation but the liquidation of the farm properties. The court had discretion to delegate these duties as it saw fit. But whatever the functional distribution, all the court officers were bound to act fairly and openly with respect to every aspect of the proceedings before the court. The mere fact that any one aspect did not fall within the delegated function of a particular court officer did not give that officer free rein to act in a secret, non-judicial manner as to that aspect. The court, as well as all the interested parties, had the right to expect that its officers would not make undisclosed private agreements, fail to reveal any

pertinent information or use their official position for their own profit or to further the interests of themselves or any associates.

It is impossible to reconcile the activities of Simkins relating to the foreclosure sales with the basic standard of conduct demanded of him as an officer of the court. One of the prime purposes of the foreclosure proceedings was to obtain enough money from the farm properties to pay in full the mortgage indebtedness, with any surplus going to the owner of the equities of redemption. All information to that end which came to Simkins or to any other court officer belonged to the court and to the parties interested in the foreclosure proceedings. Here Simkins had knowledge of a prospective purchaser of the farms who was willing to pay more than the mortgage indebtedness on the properties. Yet he made no effort to reveal this important information prior to the foreclosure sales other than to state that there "might be some parties interested" in buying the 11 farms as a unit. He was told that the court could not order a public sale of the farms as a unit. But it is clear that the court and petitioner might well have profited if Simkins had more fully revealed to them in advance of the sales that there was a prospect of selling all 11 farms to a responsible buyer at an advantageous price. Petitioner could well have been given the opportunity to bargain directly with Col. Proctor for a private sale of the farms as a unit.[4] This suppression of vital information was in no way mitigated by the partial revelation of the facts at the hearing on the motion to confirm the sales to

---

[4] The special master and the court below found that Col. Proctor was interested in purchasing the 11 farms as a unit only if he could obtain a warranty deed from Prudential. But there was no evidence that petitioner could not have furnished muniments of title equally satisfactory to Col. Proctor or that he would not have been satisfied with a warranty deed from petitioner. According to Jones, Col. Proctor "said a general warranty deed from the Prudential Insurance Company was good enough for him."

Prudential, after Prudential had accepted the resale offer, or by any subsequent knowledge obtained by petitioner. The information was most valuable prior to the foreclosure sales when the prospects were greater for successful bargaining, and it should have been divulged at that time.

Moreover it was inconsistent with his position as an officer of the court for Simkins to make a secret arrangement with Jones to bring about, by active intervention, a resale of the properties in the custody of the court. The fact that he was not a liquidating receiver did not absolve him of the duty to act openly at all times with respect to the subject matter of the proceedings. Due regard for his official position demanded that he at least notify and obtain the approval of the court and of the interested parties before entering into an employment contract with a third party wherein his compensation was dependent upon a particular bidder being successful at the foreclosure sales. This arrangement brought out in even bolder relief the reprehensibleness of Simkins' failure to disclose all the facts regarding Col. Proctor's interest in purchasing the farms. Had such facts been revealed prior to the public foreclosure sales, Prudential might not have obtained title to the farms and Simkins would not have earned any compensation under his contract with Jones. It was thus to Simkins' personal benefit not to disclose all the pertinent facts.

Since the course taken by Simkins was one which he as an officer of the court could not legally pursue and since profits resulted to him, the law makes him accountable to the trust estate for all such profits. Cf. *Magruder* v. *Drury, supra; Jackson* v. *Smith, supra*. We need not speculate as to whether his conduct operated to dampen the foreclosure sales to any appreciable degree or whether the estate was in any other way injured. It is enough that his activities had a tendency to dampen the sales. For that reason alone he may be held to forfeit all profits he derived

from his misconduct, regardless of whether it actually had an adverse effect or not. In this type of situation "the incidence of a particular conflict of interest can seldom be measured with any degree of certainty." *Woods* v. *City National Bank Co.*, 312 U. S. 262, 268. Proof of profits resulting from an irregular or conflicting course of conduct is sufficient. Simkins was thus accountable for the payments received by him from Jones for his assistance in consummating the resale of the farms from Prudential to Col. Proctor.[5]

Under the circumstances of this case, however, Simkins was not surchargeable with the commission received by Jones, with any amount received by Prudential or with the amount by which the appraised value of the farms exceeded the decree indebtedness. We perceive no basis in this record for holding Simkins responsible for any possible misconduct on the part of Jones or Prudential or for any profits that they may have obtained thereby. We do not, of course, determine in this proceeding whether petitioner could recover any such profits in a direct action against either Jones or Prudential.

## II.

Petitioner also claims that Simkins should be surcharged with all his receivership fees because of a fee-splitting arrangement which he made with Harrison and Ingalls, the attorneys for the co-receivers as well as for Prudential. The three agreed to pool the fees allowed

---

[5] It is unnecessary to consider petitioner's argument relating to the sale to Prudential of the growing crops on the farm lands, inasmuch as petitioner seeks to surcharge Simkins with the same amounts as in connection with the sale of the lands and no different considerations are present. Respondents' claim that petitioner is barred from relief because of laches is without merit. Nothing in the record indicates that petitioner discovered the full facts concerning Simkins' activities until several years after the foreclosure sales. Petitioner then made timely exceptions to the receivers' accounts.

them by the District Court and to divide them equally, although this arrangement apparently was not completely carried out.

Petitioner excepted to all credits in the receivers' accounts for fees to either Simkins or Ingalls because of this arrangement. The Court below allowed credit to the receivers for the $250 fees received by Harrison and Ingalls from the court as preliminary compensation and for all out-of-pocket expenses incurred by the two attorneys on behalf of the estate. But all credits were denied for additional attorney fees paid to them. Petitioner objects to the failure to disallow the $250 fee allowed Simkins by the District Court and the additional $1,800 fee which he paid to himself on account of his services as co-receiver.

A fee-splitting arrangement of this nature is clearly unenforceable and void as against public policy. *Weil* v. *Neary*, 278 U. S. 160. But whether the parties to such a contract should be allowed any fees at all, and if so the amount thereof, are normally matters within the sound discretion of the District Court and are not reviewable except where a clear abuse of discretion is apparent. In this case, however, the fact that Simkins entered into a fee-splitting contract so patently illegal, plus the fact that he engaged in other misconduct and indiscretions incompatible with his position as an officer of the court, compel the conclusion that all fees and compensation as co-receiver should have been denied him. Cf. *Woods* v. *City National Bank Co.*, *supra*, 268.

The judgment of the court below is reversed and the cause is remanded for further proceedings consistent with this opinion.

*Reversed.*

MR. JUSTICE ROBERTS:

I am of opinion that certiorari should not have been granted in this case and that the writ should be dismissed.

The Circuit Court of Appeals recognized established principles in determining to what extent the respondent Simkins should be denied compensation for services by reason of his acting in inconsistent relations. That court canvassed authorities which this court cites in its opinion and not only did not refuse to follow and apply them but, as I think, in perfect good faith, proceeded to examine and appraise the facts and circumstances in order to apply the relevant legal principles.

There is not a suggestion of any conflict amongst the federal courts respecting the law which should govern decision nor is there any suggestion that, on an identical set of facts, any federal court has reached a result contrary to that reached by the court below. In essence, the case presents the question whether the action taken by the Circuit Court of Appeals was sufficiently drastic in the circumstances disclosed.

I think it plain that this case falls within the category to which I referred in *Bailey* v. *Central Vermont Ry. Co.,* 319 U. S. 350, 354. All the considerations there mentioned apply equally here. If this court is to spend its time correcting mistakes in the appraisal of facts in individual cases by courts below, the performance of its essential functions necessarily will suffer.