**Paul GASKILL and Alan Hess, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Earl Dean GORDON, Kenneth F. Boula, KFB Securities, Inc., et al., Defendants,**

**Appeal of SOUTHMARK CORPORATION, Intervenor.**

**No. 92–2791.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1993.

Decided June 13, 1994.

Lawrence W. Schad, James Shedden, Beeler, Schad & Diamond, David A. Genelly, Fishman & Merrick, Chicago, IL, for plaintiffs.

Steven P. Handler, McDermott, Will & Emery, Brad L. Jensen, Martha W. Berzon, Schwartz, Cooper, Greenberger & Krauss, Stephen Ray, Stein, Ray & Conway, Chicago, IL, for defendants.

Arthur L. Klein (argued), Hal R. Morris, Michael R. Turoff, Carol L. McHugh, Arnstein & Lehr, Chicago, IL, for intervenor-appellant.

Lawrence W. Schad (argued), James Shedden, Beeler, Schad & Diamond, David A. Genelly, Kenneth F. Berg, Fishman & Merrick, Chicago, IL, for appellees.

Before CUDAHY, RIPPLE, and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

Earl Dean Gordon and Kenneth Boula engaged in a massive mail fraud scheme that eventually landed them in the federal penitentiary. In a classic Ponzi game, Gordon and Boula convinced thousands of investors to purchase interests in phony or unprofitable real estate partnerships, paying off old investors with the money from new investors. Equity Builders, Incorporated (Equity) was one of the pearls in Gordon and Boula's string.

In 1987, Equity bought an Arkansas real estate development called Diamondhead and all of the stock of Riviera Utilities of Arkansas (collectively, the "Arkansas properties") from Resort Land Corporation for $3,539,-703. Diamondhead consisted of approximately 1000 single-family lots, a fifty boat marina, a shopping center and six additional tracts of land. Riviera Utilities provided water to Diamondhead. Equity paid with two promissory notes, secured by a first mortgage on Diamondhead and other security in Riviera. Resort Land Corporation then sold the notes and mortgage to Southmark Corporation. Equity paid Southmark approximately $900,000 towards the $3.5 million purchase price, but made no payments after December 1988.

A securities fraud class action against Gordon and Boula in 1988 resulted in the appointment of Jeffrey Cagan and Cagan Realty, Inc. as receiver of Gordon and Boula's property. In March 1989, the receivership took control of Diamondhead and Riviera. A broad Receivership Order charged them with operating and managing the utility and real estate development. Although Equity was in serious default on the Southmark mortgage when Cagan took over in March 1989, Cagan refused to cure the default, claiming he had evidence that Southmark's sale of the Arkansas properties was somehow part of the Ponzi scheme. On March 16, 1989, Southmark filed for foreclosure on the mortgage. After three years of litigation, the district court for Northern District of Illinois ordered foreclosure on the Arkansas properties in March 1992.[1]

Cagan immediately filed a motion to establish a superior lien on the Arkansas properties to compensate the receivership for unreimbursed fees and expenses related to management of the properties. The district court had already approved these expenses in Cagan's quarterly fee petitions, but had allowed payment to be made from the general receivership funds with the expectation that the receivership would eventually recoup these payments by income generated from Riviera. Over Southmark's opposition, the district court established a lien for $265,000. Southmark now appeals the imposition and amount of the lien.

## I. *Establishment of Lien*

Southmark raises several arguments why Cagan is not entitled to a superior lien on the Arkansas properties. Southmark first argues, citing no authority, that the receiver in a multi-property receivership may not obtain a lien against a particular property for general receivership expenses. But this is irrelevant here, since Cagan sought a lien only for expenses incurred running Diamondhead

---

1. The foreclosure action came before Judge Nordberg while related receivership actions were pending before Judge Williams. Judge Williams granted the lien on the Arkansas properties.

and Riviera, not other properties in the receivership.

Southmark also argues that Cagan, as receiver for the defaulting mortgagor, "stands in the shoes" of the mortgagor and thus does not have standing to request a lien for expenses against a mortgagee. But an equity receiver does not merely inherit an owner's rights; the receiver is an officer of the court entrusted with administration of the property. *Booth v. Clark,* 58 U.S. (17 How.) 322, 331, 15 L.Ed. 164 (1854); *Federal Sav. & Loan Ins. Corp. v. PSL Realty Co.,* 630 F.2d 515, 521 (7th Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). "As an agent of the court, the receiver has standing to come before the court that appointed it on matters related to the costs relating to administration of the receivership property." *Gaskill v. Gordon,* No. 88–C–3404, 1993 WL 64642, 1993 U.S.Dist. LEXIS 2888 (N.D.Ill. March 8, 1993).

Certainly the district court has the authority to impose a lien on property in a receivership to satisfy the receivership expenses. Receivership is an equitable remedy, and the district court may, in its discretion, determine who shall be charged with the costs of the receivership. *Donovan v. Robbins,* 588 F.Supp. 1268, 1271 (N.D.Ill. 1984); *Pittsburgh Equitable Meter Co. v. Paul C. Loeber & Co.,* 160 F.2d 721 (7th Cir.1947). As a general rule, the expenses and fees of a receivership are a charge upon the property administered. *Atlantic Trust Co. v. Chapman,* 208 U.S. 360, 375–76, 28 S.Ct. 406, 411, 52 L.Ed. 528 (1908); *Donovan,* 588 F.Supp. at 1271. If, as here, the property is taken from the receiver's control before the receiver has been compensated, the court may "create against the property a charge or a burden, and can give title in the case of a sale provisionally, or can turn the property back to the original owner provisionally, subject to the payment of certain claims." *O'Leary v. Moyer's Landfill, Inc.,* 677 F.Supp. 807, 822 (E.D.Pa.1988) (quoting I R.E. Clark, A Treatise on the Law and Practice of Receivers, § 270 at 416 (3d ed. 1959)). Although the foreclosure order on the Arkansas properties was unconditional, the district court clearly anticipated that the property could be subject to liens obtained in other proceedings, noting, "All we are doing is selling this property *subject to whatever orders might be forthcoming in connection with the receivership.*" Tr., June 12, 1992, at 4–5 (emphasis supplied).

But Southmark contends that Cagan's lien could not displace its prior mortgage. Courts in equity have allowed liens for receivership expenses to take priority over secured creditors interests in the property when the receiver's acts have benefited the property. *See SEC v. Elliott,* 953 F.2d 1560, 1576–77 (11th Cir.1992) and cases cited therein. A receivership lien may also be appropriate if the prior lienor acquiesced to the receivership. *Id.* Illinois law specifically provides that a receiver's lien may be a superior lien on mortgaged property, so long as the receivership benefited the property and the mortgagee acquiesced in, or failed to object to, the receivership. *Rosenblatt v. Michigan Avenue Nat'l Bank,* 70 Ill.App.3d 1039, 27 Ill.Dec. 370, 375, 389 N.E.2d 182, 187 (1979); *Brackett v. Sedlacek,* 116 Ill. App.3d 978, 72 Ill.Dec. 584, 587, 452 N.E.2d 837, 840 (1983).

Southmark argues that it neither accepted nor benefited from the receivership. Southmark contends that, by filing the foreclosure action immediately upon learning of the receiver's appointment, it manifested its objection to the receivership. But this action alone does not establish that Southmark objected to the receivership that ran for the next three years. Importantly, Southmark could have moved for possession of the properties upon filing the foreclosure action, but failed to do so. The district court, commenting in the foreclosure proceeding that further litigation was necessary to sort out the liens on the property, noted that "this whole matter could have been obviated. If the mortgagee had sought to obtain possession long ago, the issue would have been raised long before." Tr. June 12, 1992, at 5. Southmark attributes the three year delay litigating the foreclosure, during which Cagan incurred almost all of the expenses at issue, to Cagan's stalling tactics and "spurious" litigation. But Southmark's contentions that it would have

preferred to run the property itself while the litigation dragged on carry little weight when it failed to take the most obvious step in that direction and move for possession of the property.

■ Southmark has also not shown that the district court erred in finding that the receivership benefited the Arkansas properties and, in turn, Southmark.[2] In his motion for a lien, Cagan described the ways in which the receivership improved the property. When Cagan took control of the property, Riviera's records were in a shambles, including large uncollected accounts, no collection mechanism, and insufficient records to prepare a tax return. Cagan claims that he straightened out Riviera's records and finances, while winning higher rates for Riviera in a rate case brought before the Arkansas Public Service Commission. In a letter to Cagan, Southmark indicated that it expected Cagan to vigorously pursue the rate case. In the end, the Public Service Commission approved a rate base calculated to allow Riviera to recoup its costs while operating the utility, but since Cagan was only in possession of Riviera for one year after the rates went into effect, Southmark will receive most of the benefits of the rate hike.

Cagan claims that the Diamondhead development was likewise in a state of disrepair. Equity did not have records identifying which Diamondhead plots it owned, and was receiving bills for real estate taxes and property association dues for plots it did not own. Cagan conducted exhaustive title searches and created a database to keep track of each plot. The district court's conclusion that these actions benefited Southmark, who will now take control of properties in better order, was not erroneous, and the court therefore had the authority to establish a superior lien to compensate the receiver.

## II. Amount of Lien

■ Southmark also objects to the amount of the lien, claiming the $265,000 award is disproportionate to the benefit bestowed on the properties and includes expenses unrelated to the Arkansas properties. The district court rejected Southmark's objection as untimely, since Southmark had been served with copies of the receiver's fee petitions before they were approved by the district court. Although Southmark objected to some of the fee petitions, it did not object to any of the fees at issue here.

Southmark argues that it did not object when it received the fee petitions because it did not know that Cagan's compensation would be paid by a superior lien on the Arkansas properties. But clearly the receiver's compensation was to be drawn from the property administered—from income if available, and otherwise as a charge against the property. Having acquiesced in the receivership, Southmark cannot now argue that it expected some other property in the receivership to compensate Cagan for upkeep of the Arkansas properties. See Central Transp. Co. v. Pullman's Palace Car Co., 139 U.S. 24, 11 S.Ct. 478, 35 L.Ed. 55 (1891);[3]

---

**2.** Southmark also contends that since Cagan was an adverse party in the foreclosure action, Cagan's actions cannot be said to have benefited Southmark. But this misses the mark, since Cagan did not seek reimbursement for expenses incurred fighting the foreclosure, but only for expenses related to operating or improving the properties pursuant to the receivership order.

**3.** "In Union Trust Co. v. Illinois Midland Ry. Co., 117 U.S. 434, 6 S.Ct. 809, 29 L.Ed. 963 [1886], after one railroad corporation had purchased of two others their connecting railroads and their franchises, a receiver had been appointed of all its property, including the three railroads, and, under the direction of the court, and without objection by any of the parties interested, had for years administered the whole as a unit, and incurred expenses and issued certificates accordingly. It was held that the holders of bonds secured by mortgage of one of the purchased railroads could not ... claim a priority of lien upon it as for certificates issued by the receiver for the necessary and proper expenses of the whole line; and this court ... rested this conclusion 'on the principle that non-action on the part of the bondholders and their trustee which allowed the court and the receivers to go on during the entire litigation, contracting debts in respect to the whole line as a unit, and administering the property as one, under circumstances where, as shown, it was and is impossible to separate the interests, as to expenditures and benefits, and where important rights have accrued on the faith of the unity of the interests amounts to such acquiescence as should operate as an estoppel.' " Pullman's Palace Car, 139 U.S. at 56, 11 S.Ct. at 487.

*SEC v. Elliott,* 953 F.2d at.1577; *see general-ly* 75 C.J.S. Receivers § 292(d)(2) (lienholder who knows of and benefits from a receivership but fails to object may be estopped from challenging establishment of a prior lien for receiver's expenses).

Southmark also argues that it did not object to the fee petitions because it did not know the expenditures in the fee petitions were related to the Arkansas properties. Certainly Southmark knew that the receiver made significant expenditures on the properties to fulfill his broad mandate. The fee petitions provided further details, describing most expenditures in sufficient detail that it is obvious they pertained to the Arkansas properties. To the extent that the fee petitions indicate that the expenditures pertained to the Arkansas properties, we agree with the district court that Southmark has waived its right to object to these entries now, long after the fee petitions were filed and approved.

 Along the same lines, Southmark contends that the $265,000 lien does not relate solely to expenditures made on the Arkansas properties, but includes expenses on other receivership properties as well. The district court found that the lien only represented expenditures on the Arkansas properties, as detailed in the quarterly fee petitions, and that Southmark's objections to specific expenditures had already been calculated into the $265,000 figure. Southmark also claimed the fees were disproportionate to the benefit bestowed on the property. The district court's award of a receiver's compensation is, of course, firmly within its discretion, *Crites, Inc. v. Prudential Ins. Co.,* 322 U.S. 408, 418, 64 S.Ct. 1075, 1081, 88 L.Ed. 1356 (1944); *SEC v. First Sec. Co.,* 528 F.2d 449, 451 (7th Cir.1976), and the court may consider all of the factors involved in a particular receivership in determining an appropriate fee. *Donovan,* 588 F.Supp. at 1273. Moreover, "a benefit to a secured party may take more subtle forms than a bare increase in monetary value. Even though a receiver may not have increased, or prevented a decrease in, the value of the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation."

*SEC v. Elliott,* 953 F.2d at 1577; *see also Donovan,* 588 F.Supp. at 1273.

 However, after scrutinizing the eleven fee petitions listing expenses from March 1989 through the end of 1991, we cannot verify the accuracy of the $265,000 figure, and thus cannot evaluate whether it represents appropriately the amount of money owed Cagan for expenses on the Arkansas properties. Neither the district court's opinion nor Cagan's motion for a lien shed any light on the matter, although the district court stated that the sum in question represented fees already approved in the fee petitions. The fee petitions separately describe the activities of the receiver, accountants and lawyers for all of the receivership properties. The summaries are broken into sub-headings including "Riviera," "Public Service Commission" (referring to Riviera's rate case) and "Equity Builders" (referring to the Diamondhead property), so it is not difficult to get a general sense of the extent of work on the Arkansas properties. The lawyers' work summaries include requested fees in each category; we can thus tell that Cagan's lawyers' fees during the relevant time period amounted to $151,975.41 ($120,559.41 for matters relating to Riviera and the rate case, and $31,416 for Diamondhead). But neither the accountants' nor receiver's work summaries similarly break down their fees by category; instead, the petition lists only a total sum for all the accountants' or receiver's work on *all* receivership properties. We thus cannot deduce, from these figures alone, what portion of these fees relate to the Arkansas properties. Detailed time sheets accompany each fee petition, and some of Cagan's sheets are clearly labelled "Equity Builders" or "Riviera Utilities." But there are also time entries listed under other headings that clearly relate to the Arkansas properties, and other time sheets do not indicate which property is at issue. Without knowing which entries concern the Arkansas properties, we cannot even roughly evaluate the reasonableness or accuracy of the $265,000 lien.

We therefore do not have sufficient information to affirm either the district court's conclusion that Southmark has waived its

254

objections to all of the $265,000 fees, or that $265,000 represents unreimbursed expenditures on the Arkansas properties. We must remand this case to the district court to set out in greater detail the expenditures included in the $265,000 lien. It seems clear from the fee petitions that the receiver spent much time on the Arkansas properties, and we have no reason to think that, when described in further detail, the $265,000 will appear unreasonable. Moreover, to the extent that the district court determines that the time entries indicate which expenditures relate solely to the Arkansas properties, we agree that Southmark cannot now object to these expenses. We therefore AFFIRM the district court's determination that Cagan was entitled to a superior lien, but VACATE the award of the $265,000 lien and REMAND to the district court to award a new lien adequately related to expenditures connected with the Arkansas properties.