[S. F. No. 19389.   In Bank.   Oct. 30, 1957.]

INDUSTRIAL INDEMNITY COMPANY (a Corporation) et al., Respondents, v. GOLDEN STATE COMPANY, LTD. (a Corporation), et al., Defendants; G. W. THOMAS DRAYAGE & RIGGING COMPANY, INC. (a Corporation), et al., Defendants and Appellants; THE ROBERT L. JOHNSON CORPORATION (a Corporation), Intervener and Appellant.

Belcher, Kearney & Fargo, Frank B. Belcher, Kenny & Morris, Robert W. Kenny, Jerome Politzer, Morris E. Cohn and Hyman & Hyman for Defendants and Appellants.

Park Chamberlain and Earl C. Berger for Intervener and Appellant.

Thelen, Marrin, Johnson & Bridges and Edward J. Ruff for Respondents.

McCOMB, J.—Industrial Indemnity Exchange (hereinafter referred to as Exchange) was a reciprocal insurance organization handling workmen's compensation insurance. Industrial Indemnity Company (hereinafter referred to as Company) also handled workmen's compensation insurance. There was considerable interrelation between Exchange and Company but no competition. Industrial Underwriters (hereinafter referred to as Attorney) was the managing entity of Exchange and Company.

In a reciprocal exchange the participants, called underwriters or subscribers, exchange insurance contracts for their mutual protection through the medium of an attorney-in-fact, who also sets rates, settles losses, compromises claims and cancels contracts. Attorney acted in this capacity for Exchange under an agreement known as Underwriters Agreement. In return for its services it received a percentage of the premiums deposited by the subscribers and was required to furnish offices and personnel for Exchange's operations out of this percentage.

Attorney, a partnership with substantially the same stock ownership as Company, also furnished offices and personnel for the latter. The Insurance Commissioner objected to the

interlacing by Attorney of its private corporation (Company) and Exchange. He made certain recommendations looking to the separation of the management of these entities or the elimination of possible conflicting loyalties through a combination of their activities.

An agreement was entered into between Company and Exchange whereby the insurance policies of Exchange would be transferred to and reinsured by Company as of December 31, 1948. The agreement provided that Company would service and run out all policies then in force and would pay the subscribers of Exchange an amount equal to the value of the entire net worth of Exchange as determined by such run-out. Consents were obtained from 98 per cent of the subscribers of Exchange to this agreement.

Subsequently Company brought an action for declaratory relief regarding the rights of the nonconsenting subscribers. Cross-complaints were filed by several sets of these subscribers. After trial, judgment was rendered in favor of Company, and the cross-complaints were ordered dismissed.

Two separate sets of defendants appealed, (1) G. W. Thomas Drayage and Rigging Company, Inc., W. R. Ballinger and Son, a corporation, and Minna M. Ballinger (hereinafter referred to as defendant Thomas Drayage and Rigging Company), and (2) Robert L. Johnson Corporation, for itself and as representative of all similarly situated co-owner subscribers of Exchange (hereinafter referred to as defendant Johnson Corporation).

On appeal it was held that the contract between Company and Exchange was illegal and void in violation of section 1101 of the Insurance Code. (*Industrial Indem. Co.* v. *Golden State Co.,* 117 Cal.App.2d 519 [256 P.2d 677].) The appellate court (1) reversed the judgment in favor of Company and remanded the case to the trial court with directions to deny all declaratory relief to plaintiffs, and (2) stated that "in the cross-actions, relief will be granted [to appellants] only with respect to the consequences of the illegality of the transfer and assumption agreement. . . . ." (See p. 540.) It then directed the trial court to grant defendants "such relief as the court will deem fit to enable them to recover in their representative capacity for subscribers the *business and assets obtained by Company in consequence of the agreement herein held to be invalid. . . .*" (See pp. 540-541.) (Italics added.)

After the reversal of the trial court's judgment defendant Johnson Corporation filed a petition for judgment and decree

pursuant to its interpretation of the effect of the appellate court's remittitur. Defendant Thomas Drayage and Rigging Company moved to strike this petition upon the ground that Johnson Corporation was a mere "intervenor" and as such not entitled to act on terms of equality with the other defendants. This motion was granted by the trial judge. Thereafter judgment was entered in favor of the defendants in the sum of $323,300.39. From this judgment both defendant Thomas Drayage and Rigging Company and defendant Johnson Corporation appeal.

### APPEAL OF DEFENDANT THOMAS DRAYAGE AND RIGGING COMPANY

In view of the former decision on appeal the trial court was limited to a determination of this issue: *What business and assets were obtained by Company in consequence of the "Transfer and Assumption Agreement"?*

There can be no question that the "agreement" held to be invalid referred to the Transfer and Assumption Agreement that was the basis of the litigation. An examination of the record discloses that the following findings of fact are sustained by substantial evidence:

"IV. Coincident with the issuance to Underwriters of the Certificate of Authority to act in liquidation of the Exchange, and on November 4, 1953, Company transferred to Underwriters and Underwriters accepted on behalf of Exchange and its subscribers, and with the approval of the Advisory Committee of Exchange, all of the business, property and assets of Exchange remaining in its hands after satisfaction of liabilities of the Exchange and which had been received by Company in consequence of the Transfer and Assumption Agreement. Underwriters has thereafter at all times continued in possession of and presently holds such business, property and assets for distribution to the subscribers of the Exchange in liquidation of its business and affairs. *As of March 31, 1954, the net worth, representing the excess of assets over liabilities, including reserves for losses incurred and to be incurred, of the business, property and assets so transferred, exclusive of the Special Surplus Account, was $323,300.39.* (Italics added.)

"V. The business, property and assets of Exchange received by Company in consequence of the Transfer and Assumption Agreement and thereafter transferred to Underwriters as found herein, included all assets and liabilities of

Exchange as reflected on the balance sheet of December 31, 1948, and which thereafter arose or accrued and all policies of insurance in force on the books of the Exchange as of December 31, 1948, and the entire experience thereon including the development of claims and premiums. All of the business, property and assets of Exchange of every kind or character received by Company from Exchange at any time, and all value attributable thereto have been returned by Company to Underwriters and are included within the net worth as set forth in Paragraph IV of these Findings. The business, property and assets of Exchange do not include any policies written by the Company after December 31, 1948, for or on behalf of any former subscribers of Exchange and the net worth as set forth in Paragraph IV of the findings does not reflect any value with regard to such policies and no accounting of any profits made by Company on such policies is any part of these findings.

"VI. Under the provisions of the Transfer and Assumption Agreement, Company, with regard to policies of insurance in force in the Exchange as of December 31, 1948, took over for its own account that portion of the 1948 policy year occurring after December 31, 1948, and under the provisions of the Transfer and Assumption Agreement no adjustment was to be made to the net worth of the Exchange payable to the subscribers with regard to this portion of the experience on those policies. That portion of the 1948 policy year taken over by Company for its own account developed to be unprofitable. This loss amounted to $156,600.53. All policies of insurance in force with Exchange as of December 31, 1948 and the entire experience on those policies, including the experience on the entire 1948 policy year, and the entire experience on policies previously issued by Exchange and expired on December 31, 1948, are a part of the business and assets of the Exchange and because of the invalidity of the Transfer and Assumption Agreement are for the account of the Exchange. This entire experience on policies of insurance in force with Exchange as of December 31, 1948, as well as the entire experience on policies previously issued by Exchange and expired on December 31, 1948, is reflected in the amount of net worth as set forth in Paragraph IV of these Findings.

"VII. All policies of insurance at any time issued by the Exchange, including those in force as of December 31, 1948, were issued subject and pursuant to the terms and provisions

of an Underwriters' Agreement executed by each of the subscribers. Under the terms of such Underwriters' Agreement, a true copy of which has been received in evidence as Defendants' Exhibit No. 6, Underwriters was appointed as Attorney-in-Fact and was entitled to receive as its fee 25 per cent of all compensation premium deposits received and 5 per cent of all savings credited to each subscriber. The subscribers or any of them did not at any time have any right to any portion of these fees to be paid to Underwriters and such fees were at all times the property of Underwriters or its assignee. The Underwriters' Agreements have at all times been in full force and effect with regard to all policies of insurance issued by or on behalf of Exchange.

"VIII. By written agreement dated January 2, 1949, a true copy of which has been received in evidence as Plaintiffs' Exhibit No. 3, following the execution of the Transfer and Assumption Agreement, Company agreed to perform for Underwriters after January 1, 1949, all of Underwriters' obligations relating to policies of insurance at any time issued by Exchange and Underwriters transferred to Company its rights to receive fees under the Underwriters' Agreement and as yet unpaid. Company performed all services required by it to be performed under such agreement. Following the decision of the District Court of Appeal, Company and Underwriters without notice to the defendants and cross-complainants G. W. Thomas Drayage & Rigging Company, Inc., W. R. Ballinger & Son, a corporation, and Minna M. Ballinger, terminated and cancelled the agreement of January 2, 1949, and without notice to the defendants and cross-complainants G. W. Thomas Drayage & Rigging Company, Inc., W. R. Ballinger & Son, a corporation, and Minna M. Ballinger, executed a written agreement dated November 15, 1953, a true copy of which has been received in evidence as Plaintiffs' Exhibit No. 4, acknowledging payment to Company of fees payable to Underwriters under said Underwriters Agreements and releasing Company of all claims by Underwriters to any fees theretofore collected by Company. All of such Attorney-in-Fact's fees have been properly taken into account in computing the net worth referred to in Paragraph IV of these findings and the subscribers have no right to any portion of such fees paid to or received, directly or indirectly, by Company or Underwriters and they do not constitute any part of the business, property or assets of Exchange to which the subscribers are entitled.

"XIII. All policies of insurance in force on the books of Exchange as of December 31, 1948, were placed with Exchange by insurance agents or brokers who were free to place this business with such insurance carriers as they chose. The decision as to the placement of any policy of workmen's compensation insurance by an insurance agent or broker was made each year as a new and distinct item of business taking into consideration all elements of coverage, cost, management and other relevant matters. The placement of a policy of insurance by an insurance agent or broker with Exchange in any one year did not mean that it would be placed with Exchange in a succeeding year.

"XIV. All policies of insurance placed with Company after December 31, 1948, on behalf of persons, firms or corporations who had formerly been policyholders of Exchange were voluntarily placed with Company as new items of business by insurance agents or brokers who were free to place such policies with such insurance carrier as they chose. The decision as to the placement of such policies of workmen's compensation insurance is made each year by the insurance agent or broker as a new item of business, taking into consideration all elements of coverage, cost, management and other relevant matters. The placement of a policy of insurance with Company in any one year does not mean that it will be placed with Company in any succeeding year. In view of these circumstances surrounding the placement of business, it cannot be determined and there is no evidence that any of these policies will be placed with the Company in the future. *None of these policies was placed with Company by reason of or as a consequence of activities of Company being performed under, or arising as a consequence of, the Transfer and Assumption Agreement or because Company was regarded in any sense as being the successor of Exchange.* All policies placed with Company were so placed because the coverage, cost and service afforded by management of Company was attractive to the policyholder and insurance agent or broker. (Italics added.)

"XVIII. Company did not use, succeed to or receive for its own account new or different information concerning past or prospective policyholders or succeed to or receive any new or different management, name, insignia, goodwill or agency plant from Exchange as a consequence of the Transfer and Assumption Agreement, nor did it at any time or in any manner receive any management, name, insignia, goodwill or

agency plant which was a part of the business, property or assets of or belonged to the subscribers of Exchange.

"XXI. In connection with its business of insurance management, Underwriters out of its own funds employed and paid all personnel, bought and owned all equipment and developed and paid its own agency plant. None of this personnel, equipment, or agency plant was or at any time has been the property of the Exchange or the subscribers of the Exchange or any part of the business, property or assets of the Exchange.

"XXII. No policies of insurance are any part of the business, property or assets of Exchange except those policies of insurance which had been placed with and were in force on the books of Exchange and no value is to be given to nor allowance made for any prospective business not in force on the books of Exchange on December 31, 1948, in determining the business, property or assets of Exchange.

"XXVI. It is not true that the compensation paid or to be paid to or for the account of Attorney-in-Fact under the provisions of the Underwriters' Agreements is in any amount or for any period any part of the business, property or assets of the Exchange or the subscribers to the Exchange.

"XXX. It is not true that any policies of insurance written or to be written by Industrial Indemnity Company on or after January 1, 1949, or at any time for, with, or on behalf of persons, firms or corporations who were former subscribers of the Exchange or any other persons, firms or corporations, or the profits therefrom or net earnings or any earnings thereon are or were any part of the business, property or assets of the Exchange or the subscribers of the Exchange or are any part of the business, property or assets of Exchange obtained by Company in consequence of the Transfer and Assumption Agreement.

"XXXI. It is not true that there are any other assets not yet discovered or identified which constitute business, property or assets of the Exchange or which were the business, property or assets of Exchange on December 31, 1948, or at any other time and which are not reflected in the net worth as referred to in Paragraph IV of these findings, and it is true that all of the business, property and assets of the Exchange and all of the business, property and assets of Exchange received by Company in consequence of the Transfer and Assumption Agreement are now in the possession of the Exchange, subject to the control of the Advisory Committee of

the Exchange, Underwriters and the Insurance Commissioner of the State of California and are reflected in the net worth as set forth in Paragraph IV of these findings."

It logically follows that since the trial court's findings are supported by evidence and covered the issues the appellate court had ordered retried, the judgment in the principal amount should be affirmed.

Defendant Thomas Drayage and Rigging Company urges the following contentions, which are without merit:

*First*: That the profits arising from the placement of policies by former Exchange subscribers with Company were part of the business or assets of Exchange.

The trial court found that none of the profits arising from the placement of policies by former Exchange subscribers with Company was part of the business or assets of Exchange. (See Findings IV, V, XIII, XIV, XXII and XXX, *supra*.)

Defendant does not attack these findings on the ground of insufficiency of the evidence, but on the ground that it is unfair and inequitable to allow Company to keep the claimed profits. This contention is unsound. The testimony of two expert witnesses showed that in evaluating the business and assets of an established insurance business, future profits or prospective earnings are never taken into account. In other words, there is no value placed upon the possibility of future earnings.

The reason is succinctly stated by one witness, Mr. Best, as follows: "Now, in the writing of that type of business [workmen's compensation] there is never any right of a policyholder to demand that his policy be renewed, there is never any right on the part of the company to demand that that policyholder renew his policy with that company. The business, in fact, is controlled first of all by the policyholder himself. He decides where he wants to put it. Then he hires a broker or agent to look after it, and he has a considerable say as to just where that business is to go, that is to what carrier company or reciprocal or what have you. Then finally the company gets the business. It happens that in that particular field there is a tremendous shifting from company to company as these annual policies expire. I had occasion to observe that particular matter, which is very striking. There is great competition for those big policies, and company A may have it this year and company B gets it next year and company C gets it the third year and so forth, so it is a transitory sort of business, and not only that, but actually in such a business every year's

operation—for that matter every renewal of a policy or acceptance of a new policy—is a new venture, so to speak. It has nothing to do with what went on before. That being so, and it being well understood that whoever carries the risk is entitled to the premium and to any profit that results because he carries the risk and must bear the loss, if there is a loss, it has always been considered that only the business that is on the books at a particular moment when the valuation is to be made can be given any weight whatever; future business itself is too uncertain.''

Likewise, the testimony of witnesses Rainey, Wright, Hullin, Lynch, Williams and Miller, all of whom are brokers of workmen's compensation insurance, support the questioned findings. They testified that policies are reviewed annually, about two months before the expiration date, loss experience is checked, the current market is also checked for risk-loss ratio, premium brackets, dividends, etc.; that they try to ''make the best deal they can'' for their clients; that the practice and custom of the ''American Agency system'' is that the brokers ''own'' the business, i.e., their customer list; and that only the broker and carrier know the expiration dates. Being the ''owner,'' the broker is free to place the business where he wishes on expiration. Each witness testified that he had placed business with Company, had placed it previously with Exchange, and had also placed business with other companies. They also stated that the Transfer and Assumption Agreement whereby Company took over Exchange had no influence whatever on their decisions to place with Company.

Several witnesses testified that they knew Company and Exchange had had the same management and when Exchange went out of business they placed their business with Company for that reason, but they also stated that they would not have done so if they could have obtained a better ''deal'' elsewhere. There was also testimony that some business was placed with Company at the client's request because of ownership interest in Company. Defendant stipulated that seven other named brokers would testify similarly.

Defendant made no attempt to rebut the foregoing testimony and produced no witnesses who testified to the contrary. Defendant's argument appears to be that even though future profits are not and were not an asset of Exchange, Company should not be allowed to keep them, not because there is any evidence of bad faith, breach of fiduciary duty, mishandling

of funds, or fraud, but because the District Court of Appeal originally found the Transfer Agreement to be void. It is obvious that there is no merit in this argument.

■ *Second*: That Company is not entitled to the "Attorney-in-Fact fees."

The questioned fees were derived from the unearned premiums of the 1948 policies, which were all written prior to the Transfer and Assumption Agreement. The trial court found that Attorney was entitled to receive a percentage of premiums for its services as attorney-in-fact; that the subscribers at no time had any right to these fees; that Company agreed to perform the obligations for Attorney and was assigned the right to receive the Attorney Fees as yet unpaid; and that these fees constituted no part of the business or assets of Exchange. (See Finding VIII, *supra*.) The trial court also found that it was not true that the compensation paid for the account of Attorney was any part of the business or assets of Exchange. (See Finding XXVI, *supra*.)

The evidence supporting the foregoing findings is: (a) the Underwriters Agreement; (b) the Transfer and Assumption Agreement; and (c) the agreement whereby Company assumed the obligations of Attorney and Attorney assigned its rights to the management fees.

The trial court was correct in finding that the Underwriters Agreement remained in effect and covered all policies written in 1948. The Transfer and Assumption Agreement did not expressly or impliedly supersede the Underwriters Agreement. Under the Underwriters Agreement the Attorney-in-Fact had full power to reinsure; it also had full power to enforce rights and discharge liabilities in the same way as an individual subscriber could do.

The Transfer and Assumption Agreement provided that Company would reinsure all outstanding policies and would perform all the obligations of Exchange under the terms of the policies. The Underwriters Agreement was a part of each policy written.

The application for insurance with Exchange provided: "This application if granted is subject to the foregoing statements and declarations and is further subject to the conditions of the following agreement which are made a part hereof and which are agreed to by the applicant as follows: . . ." Thereafter follows the Underwriters Agreement. The last clause of the agreement provides: "This agreement is strictly limited to the use and purposes herein expressed and

no other purpose; it may be terminated at any time by the subscriber or the Attorney by either giving to the other 10 days' written notice, but, until such termination shall remain in full force and effect as to all policies of insurance hereafter issued and accepted by the subscriber; within a reasonable time after such termination the subscriber's account shall be liquidated and any funds standing to his credit returned.''

The Transfer and Assumption Agreement did not purport to terminate the Underwriters Agreement or to terminate the outstanding policies. It provided for (1) reinsurance of outstanding policies, (2) the transfer of assets of Exchange, (3) assumption of liabilities of Exchange in payment to the subscribers of the ''adjusted net worth'' of Exchange, (4) time and amount of payments to subscribers, (5) payment directly to subscribers (1948 policyholders), (6) the keeping by Company of all accounts, and (7) a waiver by Attorney of all rights to the Special Surplus Fund of Exchange, reading as follows: ''In consideration of the covenants and agreements of the other parties hereto as herein contained, the Attorney-in-Fact hereby waives any and all rights it may have in and to the special surplus of the Exchange, and will not at any time hereafter assert any rights whatever in or to said special surplus.''

That the parties to the Transfer Agreement did not intend it to supplant the Underwriters Agreement is evidenced by the document executed between Attorney and Company on January 2, 1949, whereby Company agreed to perform and discharge all the obligations of Attorney with respect to the insurance issued by Exchange, and Attorney assigned to Company its rights thereunder and agreed that it would not ''at any time make any claim whatever that it is entitled to the whole or any portion of the account designated as 'Special Surplus' as shown on the books of the Exchange as of the close of business on December 31, 1948.''

There is no contention that the services were not performed in accordance with the agreement or that Attorney did not have a right to assign these fees. It thus appears from the Underwriters Agreement that the Attorney Fees were never a part of the assets of Exchange, even though they may have been obtained by Company as a consequence of the Transfer and Assumption Agreement.

■ *Third*: That the trial court erred in holding that the Special Surplus Fund was not a part of the business or assets of Exchange.

The Underwriters Agreement provided: "A Special Surplus Fund shall be created to which shall be set aside all investment income; it shall be a joint fund and no part thereof shall be credited to the account of any individual subscriber; it shall be used for the benefit of the Exchange as the Advisory Committee and Attorney may agree; if the Exchange discontinues business, any balance, after full provision for liabilities to the satisfaction of the Insurance Commissioner, shall be paid to the attorney to defray the expense of, and as compensation for, liquidation."

In accordance with the foregoing provision, the trial court found that the Special Surplus Fund was, under the Underwriters Agreement, to be reserved for expenses incurred in connection with liquidation and payable to Attorney; that on November 15, 1953, this was assigned to Company as compensation for work heretofore performed in connection with the liquidation of Exchange, less such portion as required to reimburse Attorney for future costs of liquidation; and that the subscribers have no right or claim to this surplus since it was not a part of Exchange's business or assets. (Finding IX.*)

After the District Court of Appeal's first decision, Attorney and Company entered into an agreement restoring the business and assets of Exchange to Attorney as Attorney-in-Fact of Exchange, subject to Attorney's obtaining a certificate of authority from the Insurance Commissioner. Thereafter such a certificate was issued for the limited purpose of discharging the obligations under the policies and Underwriters

---

*Finding IX reads: "Under the terms of the Underwriters' Agreements, Exchange at all times maintained a Special Surplus Fund consisting of all investment income received on Exchange funds; this fund, in the event Exchange discontinues business and after full provision for liabilities to the satisfaction of the Insurance Commissioner, is to be paid to Underwriters to defray the expenses of and as compensation for liquidation. The amount of this fund as of March 31, 1954, was $592,322.31. Underwriters by written agreement dated November 15, 1953, a true copy of which has been received in evidence as Plaintiffs' Exhibit No. 38, has agreed without notice to the defendants and cross-complainants G. W. Thomas Drayage & Rigging Company, Inc., W. R. Ballinger & Son, a corporation, and Minna M. Ballinger, to pay to Company as compensation for work heretofore performed by Company on behalf of Underwriters in connection with the liquidation of the Exchange, a sum equal to the special surplus which Underwriters may receive, less such portion of the special surplus as may be required to reimburse Underwriters for incurred and future costs of liquidation. The subscribers of Exchange have no right or claim to any portion of this special surplus and it does not constitute any part of the business, property or assets of the Exchange to which the subscribers are entitled."

Agreement, winding up the affairs of Exchange, and carrying out the liquidation of the assets, business and affairs of Exchange.

The Transfer and Assumption Agreement provided, in paragraph VII: "In consideration of the covenants and agreements of the other parties hereto as herein contained, the Attorney-in-Fact hereby waives any and all rights which it may have in and to the special surplus of the Exchange, and will not at any time hereafter assert any rights whatever in or to said special surplus."

The agreement of January 2, 1949, between Attorney and Company, paragraph (3), provided: "The Attorney-in-Fact further agrees that it will not at any time make any claim whatever that it is entitled to the whole or any portion of the account designated as 'Special Surplus' as shown on the books of the Exchange as of the close of business on December 31, 1948."

Defendant argues that Company waived its rights to this fund. The trial court found otherwise. After the first decision of the District Court of Appeal, Company reasserted its right to the fund in its answer to defendant's petition for retrial.

Under the Underwriters Agreement, Attorney-in-Fact was entitled to this fund "if Exchange discontinues business," as compensation for winding up the affairs and liquidation. The question then arises whether Exchange has been "discontinued." The trial court found that it had, and the evidence supports the finding.

It is to be noted that the Insurance Commissioner issued the certificate of authority only to the extent necessary to wind up the affairs of Exchange. Exchange has no authority to issue new policies. Since the sum is not a part of the assets of Exchange, it is clear that the trial court's disposition of it was correct.

It is also to be noted that defendant does not claim the policy contract, which included the Underwriters Agreement, was unfair or that the policyholders (subscribers of Exchange) had been taken advantage of by Company. The 1948 policyholders were in no sense injured nor was Company unfairly enriched at their expense.

Defendant's arguments to the contrary are unsupported by the record. The court found, and the evidence amply supports the finding, that future profits, Attorney Fees and the Special

Surplus Fund were not items obtained by Company as a consequence of the illegal Transfer and Assumption Agreement. The trial court also made the following findings:

"XI. All policies of insurance at any time issued to subscribers of Exchange were for a term period of one year, and the relationship of the subscriber to the Exchange terminated upon the expiration of any such policy, except for incompleted matters as to such policy, unless continued by the issuance of a new and further policy. Underwriters had no obligation to issue any new or further policy for any subscriber of the Exchange upon the expiration of an existing policy, and a subscriber had no right to demand that any such policy be issued. Underwriters, under the terms of the Underwriters' Agreements and the policies of insurance issued to subscribers, had the power to cancel any such policies of insurance and to terminate the Underwriters' Agreements at any time upon ten days' notice and in the event of such termination, Underwriters had the duty to liquidate the subscribers' account and return any funds standing to the subscribers' credit. The Underwriters' Agreements contained no provision whereby the Attorney-in-Fact could be replaced by the subscribers.

"XII. Prior to December 31, 1948, Underwriters with the knowledge and approval of the Advisory Committee of the Exchange determined that it would not thereafter issue any new policies of insurance in the Exchange and no such policies have been issued. All policies of insurance issued to subscribers of Exchange expired by their terms on or before December 31, 1949. Since December 31, 1948, Exchange has been engaged in no business except for the liquidation of Exchange."

The foregoing findings, which are not disputed, show that defendant and the other 1948 policyholders have not been injured by the execution of the Transfer and Assumption Agreement, and that they have received all to which they were entitled. Therefore, they have not suffered either injury or damage.

However, defendant claims that Company should be deprived of the benefits it received as a result of the discontinuance of business by Exchange. This claim is based upon the contention that Company has been unjustly or unfairly enriched. The evidence does not support this conclusion. During 1948 and several years prior thereto Exchange wrote the largest volume of premiums of all reciprocal workmen's compensation insurance carriers in California. When Attorney

determined to discontinue business, as it had a right to do, other insurance carriers, including Company, would, of course, obtain a share of this business. This additional business would accrue to Company regardless of the Transfer and Assumption Agreement so long as it was competitive with other carriers.

The record discloses that no policy, except where there was ownership interest involved, would have been placed with Company unless its rates or service were as good or better than other carriers. In short, the profits derived from this additional business did not arise as a consequence of the Transfer and Assumption Agreement, but as a result of Attorney's determination not to issue any new policies.

The prior decision of the District Court of Appeal held that none of the workmen's compensation business acquired by Company prior to 1948 was a consequence of the interlocking relationship between Attorney and Company, as "the Company did not at any time in the operation of its business use any funds, facilities or information belonging to, or secured through, the Exchange." (See 117 Cal.App.2d 519, 537 [256 P.2d 677].)

On retrial, the court found that "Company did not use, succeed to or receive for its own account new or different information concerning past or prospective policyholders or succeed to or receive any new or different management, name, insignia, goodwill or agency plant from Exchange as a consequence of the Transfer and Assumption Agreement, nor did it at any time or in any manner receive any management, name, insignia, goodwill or agency plant which was a part of the business, property or assets of or belonged to the subscribers of Exchange." (Finding XVIII, *supra*.)

Company received nothing, either prior to or as a consequence of the illegal Transfer and Assumption Agreement, that would give it an advantage over any other carrier in the field. It likewise appears from the record that under the "American Agency system," as practiced and in use in the workmen's compensation field, the renewals or expirations (customer lists) are owned by the agent or broker, and not by the insurance carrier. It is thus evident that Company has not been unjustly or unfairly enriched.

■ Finally, defendant claims the trial court erred in not allowing interest on the award. The trial court's position was correct. This was an equitable proceeding, and the rule is settled that in such a proceeding the matter of awarding or withholding interest is within the sound discretion of the

trial court. Interest is awarded only when such an award is fair and equitable in consideration of the facts of the particular case. (See *Leonard* v. *Huston*, 122 Cal.App.2d 541, 548 [3] [265 P.2d 566]; *Board of County Commrs.* v. *United States*, 308 U.S. 343, 352 [60 S.Ct. 285, 84 L.Ed. 313]; *Stockton Theatres, Inc.* v. *Palermo*, 121 Cal.App.2d 616, 632 [264 P.2d 74]; see also 90 C.J.S. (1955), Trusts, § 338, p. 584, and cases cited in nn. 60 and 61.)

In the present case the trial court found that Company had not acted in bad faith, and therefore we cannot say it abused its discretion in refusing to allow interest on the award.

### APPEAL OF DEFENDANT JOHNSON CORPORATION

■ Defendant Johnson Corporation contends that its cross-complaint was improperly dismissed from the action. This contention is not sound. In a stockholders' derivative action interveners are but volunteers in the main original cause, and their counsel may not participate in the presentation of the main case save as counsel for the main stockholders may consent or the court may permit. (*Mann* v. *Superior Court*, 53 Cal.App.2d 272, 280 [2] [127 P.2d 970] [hearing denied by the Supreme Court].)

In the present case the trial court was not bound to permit the intervention of others of the same class if their interests were properly protected. So far as the record discloses here, defendant Johnson Corporation's interests were fully and properly protected, and therefore the trial court did not err in dismissing its cross-complaint.

In view of our conclusions it is unnecessary to discuss other questions argued by counsel.

The judgment and orders are each affirmed.

Shenk, J., Schauer, J., and Spence, J., concurred.

SCHAUER, J.—I concur. It is my view that the issues of law have been, as such, adequately discussed and correctly disposed of in the opinion prepared by Mr. Justice McComb. Nevertheless, because opinion diverges sharply among some of the justices, it appears proper to briefly supplement our discussion.

In the arguments for the dissenting theory, respondents have been termed "wrongdoers." That term is ordinarily connotive of evil intent as well as illegal act. Under any permissible view of the record the term seems to me to be an unduly harsh epithet to be applied. As appears from the

opinion of the District Court of Appeal on the first appeal in this case (*Industrial Indem. Co.* v. *Golden State Co.* (1953), 117 Cal.App.2d 519, 527 [256 P.2d 677]), the issue of illegality of the Transfer and Assumption Agreement by reason of the then provisions of section 1101 of the Insurance Code was injected into the case by that court. Until then respondents were willing and fully intended to carry out their obligations under that agreement, which would have meant that the subscribers would have received $1,018,589.07, rather than only the $323,300.39 awarded them by the judgment which is now being affirmed. Despite this situation, the president of Company, who is also one of the partners of Attorney, testified that, regardless of the outcome of the case, it was the intention of respondents to pay the subscribers an amount equivalent to that which the subscribers would have received under the Transfer and Assumption Agreement, less costs of litigation. I believe that this further demonstrates the good faith of respondents, already conclusively shown,[1] and

---

[1] It is to be remembered that it is established that the Transfer and Assumption Agreement was entered into in good faith and had the approval of the insurance commissioner. Obviously, in the conduct of respondents, there was no union of act and evil intent. The opinion of the District Court of Appeal on the first appeal (*Industrial Indem. Co.* v. *Golden State Co.* (1953), *supra,* 117 Cal.App.2d 519) carefully notes many significant facts. Pertinent to the discussion, the opinion reads:

"[P. 526] The court found in nearly all respects for the plaintiffs and against the cross-complainants . . . The judgment declared in substance that past subscribers had no interest in the Exchange and were not entitled to participate in any distribution; that the transfer and assumption agreement was fair and equitable, validly executed and binding on all past and present subscribers of Exchange, and that they had no right to any net worth or assets of Exchange except as provided in said agreement, that said agreement distributed to the subscribers all they were entitled to in the most equitable, reasonable and practical manner and that subscribers had no interest in the business or assets of Company. . . .

"[P. 527] We have concluded that the original action for declaratory relief should have been denied because the agreement to which it relates is void as violating section 1101 of the Insurance Code, expressly made applicable to reciprocal exchanges by section 1282 of said code. Section 1101 reads insofar as applicable to this case: 'An admitted insurer's officers, directors, trustees and any persons who have authority in the management of the insurer's funds, shall not, unless otherwise provided in this code: . . . (c) Directly or indirectly purchase, or be interested in the purchase of, any of the assets of the insurer.' Section 1106, Insurance Code, reads in part: 'Any person violating . . . Sections 1101, . . . is guilty of a misdemeanor.'

"This exact point was not raised by any of the parties, but was briefed specially at the request of this court. . . .

"[P. 534] In this case the court below made most elaborate findings

evidences their continuing intention to live up to their own obligations as set forth in the agreement, if that will result in payment of a greater sum to the subscribers than would result under the judgment of the court. Respondents' unwillingness to accept the benefits of a windfall judgment—a judgment correct within the law but seemingly unjust in an equitable sense—is conduct which impresses me as more deserving of commendation than censure.

We ordinarily expect law and justice to go hand in hand; the state enacts and enforces law to achieve justice. Nevertheless, that the enforcement of law does not always result justly was recognized many generations ago, when the concept of equity was born. As declared in *Owens* v. *McNally* (1896), 113 Cal. 444, 450 [45 P. 710, 33 L.R.A. 369], "the law failing by reason of its universality, equity, to promote justice, makes good its imperfections. [Citations.]" But, regrettably, imperfections sometimes appear which not even the reach of equity can make good.

The principle articulated in section 1101 of the Insurance Code and relied upon by the District Court of Appeal in holding the Transfer and Assumption Agreement to be illegal and void was manifestly intended to promote justice. Its application in this case seems to me, however, to have resulted in a judgment which, understandably, some may feel on its face achieves the contrary, not so much, perhaps, because of the substance of the judgment now under consideration as be-

---

as to all circumstances on which it based its holding that the cross-defendants have not breached their fiduciary duty. . . .

"[P. 537] As we have held that the establishing of the circumstances under which the Attorney engaged in workmen's compensation insurance business of its own and the weighing of these circumstances in relation to the duty of fairness and good faith incumbent on the Attorney as a fiduciary were matters of fact, the decision of which by the trier of facts is as a rule binding on appeal, it seems evident that the findings stated are fatal to the appeal with respect to the claims of subscribers of Exchange to the business of Company unless appellants have shown that they are not supported by the evidence. This they have failed to do. . . .

"[P. 539] Under these circumstances it is not for us to say that the ultimate findings of the court below are necessarily improper inferences nor can we hold as a matter of law, contrary to said findings, that the Attorney breached its fiduciary duty to subscribers when it engaged in the writing of workmen's compensation insurance through the medium of Company or that the business of Company was in equity the property of Exchange. We are the more satisfied that this result is not unjust because the gain by Exchange of all profits of the business of Company without participation in them by any of Company's insureds would have given the subscribers of the Exchange a windfall wholly out of line with the setup of such Exchange."

cause of the inability of the court to enforce an agreement which had been found to be fair and just to all parties but which was held to be technically invalid. The upholding and performing of a fair and just contract would certainly appear to be promotive of justice. But the decision, on the first appeal in this case, that such contract could not be sustained has long since become final and cannot now be disturbed. That decision, in the light of the findings of fact at the first trial, which were held to be supported by the evidence, coupled with the findings in this second trial, which are also supported by the evidence, clearly precludes, under existing law, any relief beyond that granted. Similar applications of the principle (nonenforceability of a fair contract because of statutory illegality) resulting in unjust enrichment of a party have repeatedly divided this court. (See *Loving & Evans* v. *Blick* (1949), 33 Cal.2d 603, 615, 617 [204 P.2d 23]; *Franklin* v. *Nat C. Goldstone Agency* (1949), 33 Cal.2d 628, 633 [204 P.2d 37]; *Fraenkel* v. *Trescony* (1957), 48 Cal.2d 378, 383, 388 [309 P.2d 819].) In this connection it may be noted that under a 1955 amendment to the Insurance Code it appears that such an agreement as that which gave rise to the current controversy may now be legally made and performed, thus indicating that no basic principle of public policy, fairness, or justice was violated when it was executed in 1948. Neither that fact, however, nor even the overruling of the cited cases, could now affect the finality of the decision on the first appeal. I believe that the judgment of the trial court now being affirmed recognizes and correctly applies the law to the facts, which is all that the court under the limitations of the earlier holding could do, and that the carrying out by respondents of their legally unenforceable but nevertheless voluntarily self-recognized and now self-declared obligations under the Transfer and Assumption Agreement, brings this unfortunate litigation to the most desirable conclusion which under existing circumstances can be attained.

Shenk, J., concurred.

GIBSON, C. J.—I dissent. In my opinion, the majority of the court fails to apply the law correctly to undisputed facts concerning a transaction in violation of statute and, as a consequence, upholds an unjust result.

The law of the case, as decided on the prior appeal (*Industrial Indem. Co.* v. *Golden State Co.*, 117 Cal.App.2d 519

[256 P.2d 677]), is that the Transfer and Assumption Agreement by which Company took over the whole business of Exchange was void because it violated section 1101 of the Insurance Code[1] and that the subscribers are entitled to recover the business and assets obtained by Company as a consequence of that agreement. The code section was designed to protect persons such as the subscribers against the detrimental action of those in a position like that of Attorney. The subscribers, therefore, are not to be considered *in pari delicto* with Attorney and Company (*Carter* v. *Seaboard Finance Co.*, 33 Cal.2d 564, 574 [203 P.2d 758]; see *Lewis & Queen* v. *N. M. Ball Sons*, 48 Cal.2d 141, 152 [308 P.2d 713]), and the latter are the parties legally responsible for the violation, even if they acted in good faith.

It is undisputed, and the trial court found, that the Transfer and Assumption Agreement was considered fair and equitable by Attorney and Company, that it was concluded openly with the consent of the Insurance Commissioner and of 98 per cent of the subscribers, and that the net worth of Exchange which would have been distributed to subscribers in accordance with the agreement, had it not been invalid, would have amounted to $1,018,589.07. Nevertheless, the judgment of the trial court affirmed by the majority awards the subscribers no more than $323,300.39 as the value of the business and assets of Exchange taken over by Company. Thus, as the decision of the majority stands, those for whose protection the violated statute was enacted will receive less than one-third of what would have been theirs under the agreement, whereas those who are responsible for the violation will not only retain all of the benefits of the agreement but also obtain a large financial windfall. It is true that the president of Company, who is also one of the partners of Attorney, testified that, regardless of the outcome of the case, it was the intention of Company to pay the subscribers an amount equivalent to that which the subscribers would have received under the void agreement, minus costs of litigation, but a court cannot be justified in rendering a decision which compels a litigant to rely on the magnanimity of his opponent to obtain equity, unless such a result is unavoidable. I am

---

[1]Section 1101 of the Insurance Code provides: "An admitted insurer's officers, directors, trustees and any persons who have authority in the management of the insurer's funds, shall not, unless otherwise provided in this code: . . . (c) Directly or indirectly purchase, or be interested in the purchase of, any of the assets of the insurer."

satisfied that a proper application of the law to the facts before us not only permits but requires a more equitable result.

There are three matters in controversy, namely, the profits realized by Company from the issuance of new insurance policies to former subscribers of Exchange, the sum referred to as attorney-in-fact fees, and the amount constituting the special surplus fund. Although I share the view of the majority that there is sufficient evidence to support the trial court's finding that the business profits were not obtained as a consequence of the void Transfer and Assumption Agreement, I cannot agree as to the disposition of the other two items. The facts relating to them are undisputed, and only questions of law are presented. The conclusion of the majority, in my opinion, results from an erroneous application of the Underwriters Agreement to the illegal transaction under consideration.

There can be no doubt that, under the Underwriters Agreement, any right of Attorney to attorney-in-fact fees must arise from performance of the managerial functions connected with the business of Exchange. Undeniably, Attorney did not perform such functions between January 1, 1949, when the Transfer and Assumption Agreement was to take effect, and November 6, 1953, when assets of Exchange were restored by Company.[2] It is obvious, therefore, that Attorney would not be entitled to fees allocable to that period.

Nor can Company have any right to attorney-in-fact fees. Under the Underwriters Agreement, the fees were, of course, intended as compensation for management services rendered to Exchange, and, admittedly, Company did not at any time perform such services for Exchange but, instead, performed them solely for its own account, mistakenly believing that it was the owner of Exchange's business. Any claim by Company to the contractual amount of fees would necessarily depend upon an effective assignment of Attorney's rights, and there was no such assignment. The purported assignment in January of 1949 was, by its terms, made because of the Transfer and Assumption Agreement.[3] It was merely one step in the overall transaction by which Company illegally took over the busi-

[2] The agreement for restoration of assets was executed on November 3, 1953, but it was conditioned upon the Insurance Commissioner's issuance to Attorney of a Certificate of Authority, and such a certificate was issued on November 6, 1953.

[3] The purported assignment in 1949, after reciting that Attorney was the Attorney-in-Fact for Exchange and was entitled to fees for the performance of certain services, provided:

"WHEREAS, effective 12:01 A. M., January 1, 1949, all of the assets

ness of Exchange, and, therefore, it was as invalid as the main agreement. (*Stockton Morris etc. Co.* v. *California etc. Corp.*, 112 Cal.App.2d 684, 689-690 [247 P.2d 90].) The agreement of November 15, 1953, in which Attorney released its claim to fees in favor of Company, could not, of course, constitute an effective transfer to Company with respect to the period in question, since, as we have seen, Attorney had no right to fees allocable to that period.

In concluding that, by operation of the Underwriters Agreement, the sum treated as attorney-in-fact fees is not an asset of the subscribers, the majority opinion reasons, "There is no contention that the services were not performed in accordance with the agreement or that Attorney did not have a right to assign these fees." As shown above, however, insofar as the period between January 1, 1949, and November 6, 1953, is concerned, Attorney did not perform any services, Company did not perform any services "in accordance with the agreement," and no effective assignment was made. In my view, it is apparent that, even if, as assumed by the majority opinion, the Underwriters Agreement continued in force, it does not support the position taken but, to the contrary, compels the conclusion that the amount under consideration is an asset of the subscribers.

The erroneous use of the Underwriters Agreement by the majority in holding that the subscribers are not entitled to the special surplus fund is equally apparent. The agreement provided, "A Special Surplus Fund shall be created to which shall be set aside all investment income; . . . it shall be used for the benefit of the Exchange as the Advisory Committee and Attorney may agree; if the Exchange discontinues business, any balance, after full provision for liabilities to the satisfaction of the Insurance Commissioner, shall be paid to the attorney to defray the expense of, and as compensation

---

of the EXCHANGE were transferred to COMPANY and COMPANY assumed all of the obligations of the EXCHANGE including the obligation to perform certain services, for which performance the ATTORNEY-IN-FACT was, in turn, obligated to the EXCHANGE; and

"WHEREAS, under its agreement with the EXCHANGE, the ATTORNEY-IN-FACT would be entitled to receive certain moneys in addition to those earned or received by it on or prior to the close of business on December 31, 1948,

"Now, THEREFORE, IT IS AGREED BY AND BETWEEN THE PARTIES HERETO AS FOLLOWS:"

In ensuing provisions, Company agreed to perform the services required of Attorney, and Attorney transferred and assigned its rights under agreements with Exchange.

for, liquidation.'' Obviously, the fund was to be an asset of Exchange with respect to which Attorney could have no right unless there was a discontinuation and liquidation of the business in keeping with the agreement.

The majority opinion concludes, in effect, that there has been a discontinuation of business of the type contemplated in the agreement. That conclusion is manifestly unsound. It requires holding that the provision for the benefit of Attorney was intended to refer not only to an ordinary discontinuation of business but also to a situation where, as here, through Attorney's participation, the business was discontinued solely because of a sale of assets in violation of a statute which was designed to protect persons such as the subscribers against the detrimental action of those in a position like that of Attorney. Clearly, nothing done by Company during its illegal possession of the business may be regarded as constituting liquidation, since the law of the case, as decided on the prior appeal, is that the void transfer agreement under which Company acted was not an agreement for the liquidation of Exchange but one for Company's purchase of assets and assumption of liabilities. (*Industrial Indem Co.* v. *Golden State Co.*, 117 Cal.App.2d 519, 528 [256 P.2d 677].) While it appears to be true that, because of the unlawful transaction, the business cannot now be revived and must be liquidated, this cannot reasonably be treated as giving rise to any right in Attorney. The special surplus fund, which, on March 31, 1954, amounted to $592,322.31, was, of course, intended to relate to full and regular liquidation. To hold that Attorney is entitled to the fund for liquidating the remnants of a business in whose illegal destruction it participated represents an absurd application of the Underwriters Agreement. In addition, such a holding would ignore the rule that one may not take advantage of his own wrong, since the statutory violation for which Attorney and Company are responsible constitutes a wrong, regardless of good faith.

In view of the position taken by the majority, it is not necessary in this dissent to consider whether, notwithstanding the illegality of the action of Company and Attorney, some allowance should be made in their favor for the actual cost of services performed. It is clear, however, that a proper determination with respect to attorney-in-fact fees and the special surplus fund would substantially increase the recovery of the subscribers. For example, it appears to be undisputed that, even if an allowance for actual costs were made, a re-

fusal to grant Company attorney-in-fact fees would alone entitle the subscribers to approximately $324,000 more than the amount awarded in the erroneous judgment affirmed by the majority.

I would reverse the judgment.

Traynor, J., concurred.

CARTER, J.—I dissent.

The reasoning and the conclusion reached by the majority and concurring opinions are shocking to both my sense of justice and my legal concepts. If I am not mistaken this case will be appropriately classified in the annals of jurisprudence with other "crimes in ink." It is obvious to my mind and I think it should be to any unbiased person that if this court should apply the law of the case to the undisputed factual background as disclosed by the record the inevitable result would be a reversal of the judgment of the trial court with directions to retry the case in accordance with the law of the case as declared in the first decision of this case by the District Court of Appeal rendered on April 30th, 1953 (see *Industrial Indem. Co.* v. *Golden State Co.*, 117 Cal.App.2d 519 [256 P.2d 677]). Simply stated, the undisputed factual situation appears to be: Plaintiff Industrial Indemnity Company, through its officers, and by means of their financial interests, controlled both Industrial Indemnity Exchange (hereinafter referred to as Exchange) and the Industrial Underwriters (hereinafter referred to as Attorney-in-Fact). Prior to January 1st, 1949, Exchange was the largest writer of workmen's compensation insurance in California. It was a reciprocal insurance organization of which defendants Golden State Company, Ltd., G. W. Thomas Draying & Rigging Company, Inc., W. R. Ballinger & Son, Minna M. Ballinger, Johnson Corporation, et al. were subscribers. Exchange was then in competition with plaintiff Industrial Indemnity Company in writing policies of workmen's compensation insurance.

On December 21st, 1948, Industrial Indemnity Company, Industrial Indemnity Exchange, acting through its Attorney-in-Fact and Advisory Committee, and Industrial Underwriters entered into a Transfer and Assumption Agreement which provided in part:

"That in consideration of the mutual covenants herein contained the parties hereto do hereby agree as follows:

"I.  REINSURANCE

"A.  Effective as of 12:01 A.M., January 1, 1949, Exchange does hereby cede and Company does hereby completely reinsure all policies of insurance issued by the Exchange and in effect as of said time and date.

"B.  The Company agrees to carry out and perform all of the obligations of the Exchange under the terms of said policies of insurance or any of them, and to be directly liable thereon to the policyholders of the Exchange.  The Company also undertakes to declare and pay policyholders' dividends in respect to policies of insurance issued by the Exchange according to the terms of such policies on the basis of the Exchange dividend policy theretofore in effect.

"II.  TRANSFER OF ASSETS

"A.  Effective 12:01 A.M., January 1, 1949, *Exchange will sell, assign and transfer and it does hereby sell, assign and transfer to Company all of the assets of the Exchange of whatever nature and kind, whether now known or hereafter discovered, owned by it at said time and date, and whether or not appearing on its books as of said time and date.*

"III.  ASSUMPTION OF LIABILITIES AND PAYMENTS TO BE MADE

"A.  Company agrees to accept and does hereby accept the assignment and transfer of such assets as of the time and date herein provided, and agrees to perform the acts hereinafter set forth, and to pay the amounts computed as hereinafter provided at the times and in the manner hereinafter more particularly set forth.

"B.  In addition to the obligations assumed under paragraph I hereof, Company agrees to assume and discharge and does hereby assume any and all other liabilities of the Exchange of whatever nature or kind in any manner incurred prior to 12:01 A.M., January 1, 1949.

"C.  *Amounts to be paid*: As compensation for the assignment and transfer to it of the assets of the Exchange, Company will pay to the persons and in the manner herein set forth an amount equal to the 'adjusted net worth' of the Exchange, computed as follows:

"1.  UNADJUSTED NET WORTH:

"An audit of the books of Industrial Indemnity Exchange as of the close of business December 31, 1948, will be caused to be made by the Company and the Advisory Committee

as soon after December 31, 1948, as possible, and, in any event, prior to the end of the month of February, 1949. Such audit shall be conducted on the same basis as audits of the Exchange have been made in recent years, except that the reserve for losses and claims shall be computed upon the case basis rather than the 'Schedule P' formula basis. Upon completion of the audit, an audited balance sheet as of December 31, 1948, will be prepared by the Company, and upon approval by the Insurance Commissioner, shall be delivered to each member of the Advisory Committee of the Exchange. For purposes of such financial statement, the assets shall be valued at market value as of December 31, 1948. A copy of such financial statement will thereupon be attached to this agreement, marked 'Exhibit A,' and except for possible errors in computation and possible omissions all the parties hereto agree to be and are hereby bound by said financial statement.

"The unadjusted net worth of the Exchange as of the close of business on December 31, 1948, shall be the sum of the excess of statutory reserves for losses over case basis reserves for such losses, the reserve for contingencies, special surplus and unassigned surplus as shown on said financial statement. . . .

"IV. TIME AND AMOUNT OF PAYMENTS

"The total net payments, equal to the adjusted net worth, to be made by the Company to the subscribers of the Exchange will be made by the Company at the following times:

"A. $1,000,000.00 on or before March 31, 1949;

"B. $500,000.00 on or before March 31, 1950;

"C. Any balance remaining due, on or before March 31, 1952.

"By mutual agreement between the Company and the Advisory Committee, and conditioned upon the prior approval of the Insurance Commissioner, the dates for and amounts of any of the foregoing payments may be postponed or changed, as may be justified by future developments. . . .

"VII. WAIVER BY ATTORNEY-IN-FACT OF RIGHTS IN SPECIAL SURPLUS:

"In consideration of the covenants and agreements of the other parties hereto as herein contained, the Attorney-in-Fact hereby waives any and all rights which it may have in and to the special surplus of the Exchange, and will not at any time hereafter assert any rights whatever in or to said special surplus. . . .

"IX. RETURN OF SUBSCRIBERS' INDIVIDUAL SURPLUS FUND DEPOSITS:

"The Company agrees to pay to the individual subscribers entitled thereto the total amount of the subscribers' individual surplus fund deposits paid or maintained as of December 31, 1948, by each of said subscribers, such payment to be made to each individual subscriber entitled thereto on or within a reasonable time after the termination of his policy. However, in the event that at such time there shall be due and owing from such subscriber any premium arising under a policy issued by the Exchange on or before December 31, 1948, such subscriber's individual surplus fund deposit shall, to the extent of any such premium due and unpaid, be credited or applied in payment thereof." (Emphasis added.)

At the time this agreement was executed K. K. Bechtel was president of Industrial Indemnity Company. He was also managing partner of Industrial Underwriters, Attorney-in-Fact for Industrial Indemnity Exchange. While Mr. Bechtel did not sign the contract on behalf of Industrial Indemnity Company, he signed it as managing partner of Industrial Underwriters, Attorney-in-Fact for Industrial Indemnity Exchange and as a member of the Advisory Committee of Industrial Indemnity Exchange and as managing partner of Industrial Underwriters. The contract was executed on behalf of Industrial Indemnity Company by Thomas G. McGuire, Executive Vice-President. It was found by the trial court and conceded by all of the parties to this litigation that Mr. Bechtel and his associates in Industrial Indemnity Company, by virtue of their financial interests, controlled all of the parties to said agreement. In this respect the District Court of Appeal in its first decision of this case cited *supra* stated: "Neither is it denied nor could it be denied that the members of the Attorney are persons who have authority in the management of the funds of the Exchange. The interrelation between the Attorney and the Company, which is at the basis of this whole case, leaves no doubt that said partners in the Attorney would be interested in, at least indirectly, any purchase made by the Company. In this respect it will suffice to quote from finding 16 of the court the following passus which is not attacked:

" 'The stock ownership of Industrial Indemnity Company has at all times been substantially the same as the ownership of Industrial Underwriters, a partnership, the attorney-in-

fact of the Exchange.' '' (117 Cal.App.2d 519, 527, 528 [256 P.2d 677].)

Prior to the execution of said Agreement an attempt had been made by Mr. Bechtel and his associates to procure the consent of all of the subscribers of the Exchange to said Transfer and Assumption Agreement and they succeeded in obtaining the consent of approximately 98 per cent of said subscribers. Industrial Indemnity Company then commenced an action in the superior court of the City and County of San Francisco seeking declaratory relief regarding the rights of subscribers of Industrial Indemnity Exchange, under said Agreement. The nonconsenting subscribers cross-complained in said action, claiming that all the insurance business transacted by Industrial Indemnity Company belonged in equity to Exchange, from whose business it was alleged to have been disloyally diverted by Industrial Underwriters, the Attorney-in-Fact of said Exchange, whose partners substantially owned the stock of Industrial Indemnity Company.

The trial court awarded plaintiff Industrial Indemnity Company the relief demanded by it in said action and denied any relief to the objecting subscribers.

The subscribers appealed and the District Court of Appeal in its decision cited *supra,* reversed the judgment and decree of the trial court and laid down the following rules which constitute the law of the case and should have controlled the subsequent disposition of the case:

(1) The District Court of Appeal specifically held that the Transfer and Assumption Agreement constituted a sale of all of the assets and business of Exchange to Company. In this respect the court stated at page 530: ''Respondents urge, however, that even if it were an actual sale, *as we consider it,* the agreement would come under an exception to section 1101 [of the Insurance Code]. . . .'' (Emphasis added.)

(2) The District Court of Appeal specifically held that Exchange was not in liquidation. In response to the contention of Company that the Transfer and Assumption Agreement was actually an agreement to liquidate, the court stated at pages 528 and 529: Company contends that ''the transaction was actually an agreement to liquidate. However that is not the case. . . . Another circumstance which shows that the Company did not act merely as liquidator is of greater importance from a practical point of view. By taking over all assets, assuming all liabilities, including all outstanding policies of the Exchange and becoming directly liable thereon

to the policyholders, the Company acquired the whole business of the Exchange as a going concern and would therefore benefit by the increase of its clientele."

(3) In answer to Company's contention that the Insurance Commissioner could require the sale of Exchange to Company (section 1105) the District Court of Appeal specifically held at page 530: "The contention is without merit. The Commissioner did not require and had no power to require the sale of the whole business of the Exchange as a going concern. To 'require' in this sense means 'to demand; to claim as by right and authority; to exact.' (Webster.) The Commissioner did not demand it and had no authority to demand it."

(4) The District Court of Appeal held that the Transfer and Assumption Agreement was illegal and void because in contravention of section 1101 of the Insurance Code, which provides that an admitted insurer's officers, directors, trustees or any persons having authority to manage the insurer's funds shall not "directly or indirectly purchase, or be interested in the purchase of, any of the assets of the insurer." It further held that section 1106 makes any violation of section 1101 a misdemeanor. In this respect the court stated at page 527: "We have concluded that the original action [brought by Company] for declaratory relief should have been denied because the agreement to which it relates is void as violating section 1101 of the Insurance Code, expressly made applicable to reciprocal exchanges by section 1282 of said code."

(5) With respect to the contentions made by Company that it acted in "good faith" because it did not know the law forbade the transaction and made such a violation of the law a crime, the court stated at page 532: "Even if their said conduct was in good faith and proper, as found by the court below, it would create a precedent wholly adverse to the purpose of section 1101, subdivision (c), if they were permitted to solve the difficulties so caused by absorbing the going business of the Exchange into their privately owned corporation, even if the price they paid for it would be adequate."

(6) The District Court of Appeal specifically held that the officers of plaintiff and the other parties to the Agreement were acting in a fiduciary capacity and could not seize for themselves the assets of Exchange as contemplated by the Transfer and Assumption Agreement. At page 533 the court said: "Since the leading case of *Guth* v. *Loft*, 23 Del.Ch. 255 [5 A.2d 503], it has been generally accepted that a corporate

officer or director may not seize for himself to the detriment of his company business opportunities in the company's line of activities which the company has an interest and prior claim to obtain, and that if he seizes them in violation of his fiduciary duty the corporation may claim for itself all benefits so obtained by him. The doctrine was applied in this state to joint venturers in *MacIsaac* v. *Pozzo,* 81 Cal.App.2d 278 [183 P.2d 901], and is equally applicable in all situations in which a person manages or transacts business for another or for others to whom he stands in a fiduciary relation without being trustee of an express trust. The position of the attorney-in-fact of a reciprocal insurance exchange, who manages the business of the exchange under powers of attorney of the subscribers, who provide the means for the reciprocal insurance enterprise, is fiduciary in character to the same extent as that of the management of an incorporated mutual insurance company, although neither is a real trustee. (See *Caminetti* v. *State Mut. Life Ins. Co.,* 52 Cal.App.2d 321, 323 [126 P.2d 165]) and the doctrine of corporate opportunities is equally applicable.''

With respect to the language of the court concerning the evidence as supporting the findings of fact of the trial court that Company had not breached its fiduciary duty toward Exchange, it is obvious that it was referring to the contention of Exchange that it was entitled to the *whole business of Company* because it said at page 539: ''Under these circumstances it is not for us to say that the ultimate findings of the court below are necessarily improper inferences nor can we hold as a matter of law, contrary to said findings, that the Attorney *breached its fiduciary duty to subscribers when it engaged in the writing of workmen's compensation insurance through the medium of Company or that the business of Company was in equity the property of Exchange. We are the more satisfied that this result is not unjust because the gain by Exchange of all profits of the business of Company without participation in them by any of Company's insureds would have given the subscribers of the Exchange a windfall wholly out of line with the setup of such Exchange.''* (Emphasis added.)

The findings of the trial court that Company had not breached its fiduciary duties toward Exchange were, therefore, held by the District Court of Appeal to relate to Company's participating in the workmen's compensation insurance field before the illegal take-over of Exchange; and to

Exchange's contention that it was entitled to *all* of *Company's* business developed prior to such take-over. It is obvious that this discussion on the part of the District Court of Appeal does *not* relate to Company's breach of its fiduciary duty to Exchange in executing the Transfer and Assumption Agreement, which it had theretofore held to be an invalid, illegal and void agreement of purchase and sale.

The conclusions reached in the District Court of Appeal opinion were as follows: 1. "Although we hold that the subscribers of Exchange are not entitled to the business built up by Company in general—and then they are necessarily not entitled either to the business of its wholly owned subsidiary, Industrial Service Company, mentioned separately on appeal—*they have a right to the business taken over by Company in consequence of the transfer and assumption agreement, which we have held to be invalid.* If they so desire they are entitled to have that matter wound up in these equity proceedings and for that purpose the judgment denying all relief on the cross-complaints [by Exchange] will also have to be reversed." (Emphasis added.)

2. The trial court was directed to "deny all declaratory relief to plaintiffs [Company] on the ground that the agreement as to which it is prayed for is void as contrary to law. . . ."

3. The trial court was directed to grant such relief to Exchange as to permit them to recover in "their representative capacity for subscribers *the business and assets obtained by Company in consequence of the agreement herein held to be invalid. . . .*" (Emphasis added.)

The gist of the decision of the District Court of Appeal cited *supra* which is now the law of the case, may be summarized as follows: The Transfer and Assumption Agreement dated December 21st, 1948, constituted an attempted sale of all of the business and assets of Exchange to Industrial Indemnity Company. Such a sale was illegal in face of the objection of the nonconsenting subscribers to Exchange. The illegality of such sale and transfer was based both upon common law rules and statutory law of this state. It violated common law rules because the officers of the participating companies were acting in a fiduciary capacity to the subscribers of Exchange. Those officers violated their fiduciary duty under the common law by appropriating to their own use the property of the subscribers of Exchange without their consent. The legal effect of this transaction was that the directors and officers of

Company, who, because of their financial interests, controlled Exchange, Industrial Underwriters and Attorney-in-Fact, used their power of control to deprive subscribers of Exchange of their property rights in Exchange in violation of their fiduciary duty to subscribers which no court of justice should sanction. The transaction was in violation of the statutory law of this state because expressly and specifically prohibited by section 1101 of the Insurance Code, the violation of which section was made a misdemeanor by section 1106 of the Insurance Code. Because the entire transaction was illegal for the reasons above stated and the participants therein were guilty of a crime under the law of this state, Industrial Indemnity Company had no standing in a court of justice to enforce the Agreement and its action brought for this purpose was ordered dismissed. The court, however, reserved to the non-consenting subscribers the right to resort to the court for the protection of their rights which should contemplate the restoration by Company to the Exchange of the business and assets illegally appropriated or an award of compensation adequate to cover the value of such business and assets so illegally appropriated together with all accrued increments therefrom.

It is obvious that the trial court on the retrial of the case utterly disregarded the law of the case as declared by the first opinion of the District Court of Appeal cited *supra*. In direct violation of the law of the case announced in said decision the trial court held and found that Industrial Indemnity Company took over the business and assets of Exchange for the purpose of liquidation and that Exchange was not entitled to the going concern value of its business at the time of the illegal transaction. It charged Exchange with the cost and expenses incurred by Company in winding up the business of Exchange and awarded to Company assets of Exchange worth considerably over a million dollars without awarding subscribers of Exchange any compensation therefor.

The obviously palpable result and legal effect of the decision of the trial court on the retrial of this case was to deprive the subscribers of Exchange of their property which consisted of a valuable beneficial interest in the business of Exchange without due process of law. A clear and concise statement with respect to the protection of the right of private property under the Fourteenth Amendment to the Constitution of the United States was made by Mr. Justice Day of the Supreme Court of the United States in *Buchanan* v. *Warley*, 245 U.S.

60, at page 74 [38 S.Ct. 16, 62 L.Ed. 149]. Speaking for a unanimous court he there declared: "The Federal Constitution and laws passed within its authority are by the express terms of that instrument made the supreme law of the land. The Fourteenth Amendment protects life, liberty, and property from invasion by the States without due process of law. Property is more than the mere thing which a person owns. It is elementary that it includes the right to acquire, use, and dispose of it. The Constitution protects these essential attributes of property. *Holden* v. *Hardy*, 169 U.S. 366, 391 [18 S.Ct. 383, 42 L.Ed. 780]. Property consists of the free use, enjoyment, and disposal of a person's acquisitions without control or diminution save by the law of the land. 1 Blackstone's Commentaries (Cooley's Ed.), 127." In *Brinkerhoff-Faris Co.* v. *Hill*, 281 U.S. 673 [50 S.Ct. 451, 74 L.Ed. 1107], the Supreme Court of the United States specifically held that judicial action as state action is within the due process clause of the Fourteenth Amendment. At pages 681 and 682 the court stated: "But, while it is for the state courts to determine the adjective as well as the substantive law of the State, they must, in so doing, accord the parties due process of law. *Whether acting through its judiciary or through its legislature,* a State may not deprive a person of all existing remedies for the enforcement of a right, which the State has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it. Compare *Postal Telegraph Cable Co.* v. *Newport,* 247 U.S. 464, 475-6 [38 S.Ct. 566, 62 L.Ed. 1215]." (Emphasis added.)

We have here a situation where the beneficial interests—the property rights of Exchange and subscribers in the business and assets of Exchange are taken from them by Company without their consent and in violation of both common law rules and statutory law, and Company and its officers committed a crime under the law of this state when it and they appropriated the property of Exchange and subscribers to the use of Company by means of the illegal and void Transfer and Assumption Agreement. Under every concept of law, equity, justice or fair dealing, Exchange and subscribers are entitled to have their property or its full value restored to them with all accrued increments. But under the majority decision in this case, property, admittedly worth approximately two million dollars at the time it was illegally appropriated by Company, with all its accrued increments of

many millions of dollars, is retained by Company, and subscribers are awarded the paltry sum of $323,300.07, probably 2 or 3 per cent of the present value of the property and its accrued increments now in the hands of Company. I cannot conceive of such a travesty on justice occurring under any system for the administration of justice entitled to the respect of honest, fair-minded men. I have always believed that the requirement of the due process clauses of both our state and federal Constitutions contemplates a fair and honest application of the settled rules of law to every established factual situation. Only by this process may justice be achieved. The result reached by the majority here today does violence to every concept of due process of law with which I am familiar.

The majority glosses over the damning fact that in seizing the business and assets of Exchange in the manner shown by the record here, Company and its officers committed a crime—a misdemeanor (see Ins. Code, §§ 1101, 1106) — and since overt acts were committed in the furtherance of an unlawful agreement, the crime amounted to a felony under the law of this state (Pen. Code, § 182; *Calhoun* v. *Superior Court,* 46 Cal.2d 18 [291 P.2d 474]; *People* v. *Malotte,* 46 Cal.2d 59 [292 P.2d 517]; *Lorenson* v. *Superior Court,* 35 Cal.2d 49 [216 P.2d 859]; *People* v. *Robinson,* 43 Cal.2d 132 [271 P.2d 865]; *People* v. *Vanderpool,* 20 Cal.2d 746 [128 P.2d 513]).

The illegal and void Transfer and Assumption Agreement itself makes out a clear case of conspiracy to violate sections 1101 and 1106 of the Insurance Code by the participants in this illegal transaction. Of course, no prosecution was instituted against them. This is just another example of the unequal administration of our criminal law. There can be no doubt that the power and influence of the participants in this illegal transaction weighed heavily in the determination of the prosecuting officials not to proceed against them under the above cited authorities. We also find two justices of this court (see concurring opinions of Justices Schauer and Shenk) expressing their approval and commendation of the unlawful conduct of these participants in the consummation of this illegal transaction. This demonstrates the truth of the charge made by some critics of our judicial system that those with sufficient wealth, power and influence can evade the law and that the phrase "equal justice under law" is empty and meaningless in such situations. It is obvious that on the record before us justice has been outraged by the result reached by the majority and those who believe in the ideal

of "equal justice under law," as well as the victims of this travesty, will look for an explanation. In my considered opinion it may be found only in the inferences which may be drawn from the time honored epigrammatic expression that "You can't convict a million dollars."

The essential facts of the controversy here are really very simple: Company and Attorney (made up of the same membership so really one and the same person legally speaking) contracted with a majority of the membership of Exchange for the purchase of the assets of Exchange some of whose members refused to consent to the purchase and sale. The purchase price was $1,018,539.07. After a series of legal maneuvers (to be discussed hereinafter), instigated by Company, Exchange subscribers, the innocent victims of the swindle, are held legally entitled to only the sum of $323,300.39.

Company brought the original action for declaratory relief regarding the rights of subscribers of Exchange. The original action culminated in an estimated award to *Exchange* of $1,895,347.07. *Exchange appealed.* The District Court of Appeal reversed on the ground that the Agreement was illegal, void and of no effect, and directed that an accounting be had to determine the value of the "whole going business" of Exchange which had been, by means of the Agreement, illegally taken over by Company. *Company,* believing it had *lost* in the District Court of Appeal, petitioned this court for a hearing. We *denied* a hearing. The opinion of the District Court of Appeal (117 Cal.App.2d 519 [256 P.2d 677]) thereby became the law of the case on a retrial of the action.

On retrial Exchange recovered $323,300.39 as the value of their "whole going business" which had been illegally taken over by Company as compared with the sum of $1,895,347.07 recovered by it at the first trial from which judgment *Exchange* had appealed and won a reversal. The judgment rendered on the second trial was appealed by Exchange and determined by the same District Court of Appeal which had heard the first appeal. On the second appeal ((Cal.App.) 301 P.2d 112) the judgment was again reversed with the District Court of Appeal holding that the decision theretofore rendered by it had not been followed by the trial court and stating, among other things, that because of the judgment on retrial "the Company will have in fact everything, for which it agreed in the invalid agreement to pay considerably more than one million dollars to the subscribers and will pay for it only $323,300.39."

At the time of the second trial the evidence showed indisputably that Company had collected over 20 million dollars in gross premiums because of the increased business it had obtained through the illegal take-over of Exchange. The net profit was not ascertained. The District Court of Appeal specifically held, on the first appeal, that by means of the illegal agreement Company increased its clientele. It was there held that by its illegal agreement "the Company acquired the whole business of Exchange as a going concern and would therefore benefit by the increase of its clientele." Consents to the illegal agreement were obtained by sending out, in addition to 80 or 90 solicitors of consents, a letter which read, in part: "At normal expiration of your policy, in 1949 you will be offered a participating policy in Industrial Indemnity Company, a stock company. . . . Your policy with Industrial Indemnity Company will be serviced by the same personnel, located at the same offices as in the past." The District Court of Appeal (117 Cal.App.2d 519 [256 P.2d 677]) commented on Company's tactics as follows: "That *in this manner* the Company received an advantage not consistent with the position of a mere liquidator seems obvious."

By the holding of the majority here, Company profits by its illegal conduct in that it is permitted to:

1. Retain all the net profits directly traceable to former Exchange subscribers although the loss experience was deducted from Exchange's recovery;

2. Retain the special surplus fund of *$592,322.31* and the increment thereof to which it was not entitled since Exchange was not in liquidation but had been illegally put out of business by Company and since the original underwriters' agreements were no longer in existence;

3. Retain the Attorney-in-Fact fees which amounted, at the time of trial, to $324,751.07 to which it was not entitled since the original underwriters' agreements were no longer in existence but were superseded by the illegal agreement.

In the majority opinion the issue as to net profits is discussed and the discussion relative thereto consists of quoting thirteen findings of fact and then making the bald, unadorned statement that "It logically follows that since the trial court's findings were supported by evidence and covered the issue that the appellate court had ordered to be retried, the judgment in the principal amount should be affirmed."

A slight attempt is made in the majority opinion to show that these findings are supported by the evidence in that

certain testimony is quoted to the effect that since the policies were renewed annually there was no assurance that Exchange would have had *any* future subscribers had it not been illegally put out of business. Inasmuch as the record, as the majority admits, shows that Exchange had been the largest company of its kind for a great number of years prior to being illegally put out of business by Company, the theory behind the majority opinion that Exchange would probably not have continued in business in any event is nothing short of ridiculous. Absolutely no attempt is made in the majority opinion to reconcile the findings made by the trial court with the law of the case as set forth by the District Court of Appeal in its first opinion (117 Cal.App.2d 519 [256 P.2d 677]). Isolated bits of testimony extracted from the enormous record before us in support of erroneous findings do not concern us, or should not concern us, when there is a question of law involved. *We are not concerned with whether or not the evidence supports these erroneous findings and conclusions since it is obvious that the trial court was not following the law of the case as laid down by the decision of the District Court of Appeal, supra.* The very fact that the trial court considered Exchange to be in liquidation shows the error, since liquidation is the antithesis of a going business concern. It is also obvious that the judgment permitting Company to obtain all assets of Exchange for a lesser figure than that provided for in the void Agreement is in contravention of the holding of the District Court of Appeal that Company and Attorney stood in a fiduciary relationship so far as Exchange was concerned and that a fiduciary may not benefit by a breach of its duties to its beneficiary. The District Court of Appeal specifically held in its first opinion (117 Cal.App.2d 519 [256 P.2d 677]) that the doctrine of corporate opportunities was applicable; that if a corporate officer or director seized for himself such opportunities "in violation of his fiduciary duty the corporation may claim for itself *all benefits so obtained by him*" (emphasis added) 117 Cal.App.2d at p. 533) and that the purchase of Exchange constituted the breach of Company-Attorney's fiduciary duty to Exchange subscribers. This court held in *Estate of Baird,* 193 Cal. 225, 258 [223 P. 974], while discussing the law of the case as decided in a former appeal in the same case, that "It was no part of the trial court's function to determine whether the former appeal had been correctly decided; its sole duty was to follow without question the principles established by that decision. This

the trial court failed to do, and the instructions we have condemned are therefore prejudicially erroneous within the meaning of the constitution (sec. 4½, art. VI)." We also held (*Central Sav. Bank of Oakland* v. *Lake,* 201 Cal. 438, 443 [257 P. 521]) that "It has long been the law of this state that an unqualified reversal remands the cause for a new trial (*Falkner* v. *Hendy,* 107 Cal. 49, 54 [40 P. 21]), and places the parties in the trial court in the same position as if the cause had never been tried, *with the exception that the opinion of the court on appeal must be followed so far as applicable* (*Sharp* v. *Miller,* 66 Cal. 98 [4 P. 1065]; *Estate of Pusey,* 177 Cal. 367 [170 P. 846])." (Emphasis added.) (See also *Wells* v. *Lloyd,* 21 Cal.2d 452, 457 [132 P.2d 471]; *Chamberlain Co.* v. *Allis-Chalmers Mfg. Co.,* 74 Cal.App.2d 941, 943 [170 P.2d 85]; *Steelduct Co.* v. *Henger-Seltzer Co.,* 26 Cal.2d 634, 643 [160 P.2d 804]; *Wallace* v. *Sisson,* 114 Cal. 42, 43 [45 P. 1000]; *Porter* v. *Muller,* 112 Cal. 355, 366 [44 P. 729]; *Clark* v. *Deschamps,* 109 Cal.App.2d 765 [241 P.2d 681].)

We are not here concerned with the method by which Exchange's recovery should be determined since that is a matter to be determined on a retrial upon evidence given by experts in the insurance actuarial field. We are concerned here with what items should be considered a part of the subscribers' recovery.

### Future Profits

In order to demonstrate conclusively that the findings do not follow the law of the case as set forth by the District Court of Appeal, I will summarize that court's holdings and compare them with the trial court's findings:

1. The District Court held that the Transfer and Assumption Agreement constituted a *purchase* by Company of Exchange and that such Agreement was illegal and void. It was specifically held that Exchange was *not* in liquidation.

Finding IV recites that Underwriters hold the property and assets of Exchange "for distribution to the subscribers of the Exchange in *liquidation of its business and affairs.* . . ."

Company contended on the first appeal that the Agreement "was actually an agreement to liquidate." The District Court of Appeal said: "However, that is not the case. . . . Another circumstance which shows that the Company *did not act merely as liquidator* is of greater importance from a practical point of view. By taking over all assets, assuming all liabilities, including all outstanding policies of the Exchange and becoming directly liable thereon to the policyholders, the

Company acquired the *whole business of the Exchange as a going concern and would therefore benefit by the increase of its clientele."* (117 Cal.App.2d at 528, 529.)

2. The District Court of Appeal held the Transfer and Assumption Agreement illegal, void and of no effect.

Finding VI is to the effect that under the Agreement "no adjustment was to be made to Exchange with respect to the experience on the portion of the 1948 policies taken over thereunder; that because of the invalidity of the Agreement, the loss thereon must be charged up to Exchange." That loss experience amounted to *$156,600.53.*

Finding V recites that no policies written after December 31, 1948, for or on behalf of any former subscribers of Exchange form any part of the net worth of Exchange.

These findings are in direct conflict with the express holding of the District Court of Appeal that Company illegally and unlawfully took over the *"whole going business of Exchange."*

Findings XIII and XIV are to the effect that policies of insurance were placed voluntarily with either Exchange or Company on a year to year basis and that all policies placed with Company after December 31, 1948, on behalf of persons who had formerly been policyholders of Exchange were voluntarily placed with Company as new items of business by insurance agents who were free to place such policies with such insurance carrier as they chose. Finding XIV concluded that no policy was placed with Company "by reason of or as a consequence of activities of Company being performed under, or arising as a consequence of, the Transfer and Assumption Agreement or because Company was regarded in any sense as being the successor of Exchange."

*The District Court of Appeal held firmly and unequivocally that due to Company's conduct in sending solicitors out and in mailing a letter to all Exchange subscribers it obtained an increase in its clientele to which it would not otherwise have been entitled.*

Finding XVIII recites that Company did not use or receive any information from Exchange as a consequence of the illegal agreement.

Company had the information due to the interlocking relationship between it and Attorney and it was due to that information that it was able to contact all Exchange subscribers and obtain their business on the theory that the business placed with it would be serviced with the *same personnel and from the same offices* as it had been when Exchange

was a going business concern. Furthermore, the solicitation and letters were both accomplished while Exchange was still a going concern.

Finding XXXI recites in effect that it is not true that Exchange was entitled to any future profits.

This of course directly belies the mandate of the District Court of Appeal that Company illegally took over the *whole going business of Exchange*; that an accounting should be had to determine the value thereof; that Company increased its clientele through its illegal tactics. *The evidence also showed indisputably that Company had collected over 20 million dollars in gross premiums due to the increased business it had obtained because of the illegal take-over of Exchange.*

The only effort made in the majority opinion to comply with the law of the case is to set forth the findings on the retrial and state without amplification that they are within the issue ordered to be retried and that they are supported by the evidence.

The District Court of Appeal (117 Cal.App.2d 519 [256 P.2d 677]) did *not* hold that Exchange was not entitled to the profits accruing by reason of the illegal take-over of its business by Company. It *did* hold that Exchange subscribers were not entitled to the profits made from *both* Exchange and Company business. The court had this to say (p. 539): "Under these circumstances it is not for us to say that the ultimate findings of the court below are necessarily improper inferences nor can we hold as a matter of law, contrary to said findings, that the Attorney *breached its fiduciary duty to subscribers when it engaged in the writing of workmen's compensation insurance through the medium of Company or that the business of Company was in equity the property of Exchange. We are the more satisfied that this result is not unjust because the gain by Exchange of all the profits of the business of Company without participation in them by any of Company's insureds would have given the subscribers of the Exchange a windfall wholly out of line with the setup of such Exchange.*" (Emphasis added.) The emphasized portion shows clearly that the District Court was referring to the *business* of *Company* as distinguished from the *profits made by Company from the business taken away from Exchange subscribers* since the statement was in answer to a contention made by Exchange that it was entitled to *all* of Company's business in the compensation insurance field before the unlaw-

ful take-over as well as all of its own business and the profits made therefrom after the take-over. This argument was based upon the theory that Company had breached its fiduciary duty by going into competition with Exchange in the compensation insurance field before the unlawful take-over.

As I have shown, *the findings do not comply with the law of the case* (117 Cal.App.2d 519 [256 P.2d 677]). Although I do not believe that the evidence *does* support the findings that were made, and certainly very little effort is made in the majority opinion to recite any of the evidence said to be sufficient, it is immaterial in any event since the findings are not in accord with the law of the case. The very fact that the trial court's findings and conclusions show, indisputably, that it considered that *Exchange was in liquidation* shows the error since liquidation is the antithesis of a going business concern. It is also obvious that the judgment permitting Company to obtain all assets of Exchange for *a* lower figure than that provided for in the void Agreement is in contravention of the holding of the District Court of Appeal that Company and Attorney stood in a fiduciary relationship so far as Exchange was concerned and that a fiduciary may not benefit by a breach of its duties to its beneficiary.

So far as business profits are concerned, the law is that where there has been a breach of a fiduciary duty, a constructive trust is imposed upon a person in order to prevent his unjust enrichment. In most cases where a constructive trust is imposed, the result is to restore to the injured person property of which he has been unjustly deprived and to take from the wrongdoer property, the retention of which by him, would result in a corresponding unjust enrichment of the wrongdoer. (*Koyer* v. *Willmon,* 150 Cal. 785 [90 P. 135]; *Broder* v. *Conklin,* 121 Cal. 282 [53 P. 699]; *Johnson* v. *Clark,* 7 Cal.2d 529 [61 P.2d 767]; *Forman* v. *Goldberg,* 42 Cal.App. 2d 308 [108 P.2d 983]; Rest., Restitution, §§ 160, 190.) It follows logically from the foregoing that before Exchange may be made whole for what has been illegally taken from it by Company, the latter must be forced to return to Exchange that which was taken together with the profits made therefrom.

Exchange introduced evidence showing that it was possible to trace former Exchange business for·the five-year period subsequent to the execution of the illegal Agreement. The majority would have us assume that had the illegal Agreement not been executed all of Exchange subscribers would have ceased being Exchange subscribers and placed their business

with Company. This assumption is neither logical nor probable; Exchange had been a prosperous going concern for many years prior to the execution of the Agreement and would, in all probability, have continued as one. The majority holding that Exchange subscribers are entitled to no reimbursement from Company after the expiration of the last yearly policy issued by Exchange is a judicial sanction of something which the law has always abhorred—*that a wrongdoer be permitted to profit from his own wrong.*

Company-Attorney stood in a fiduciary relation to Exchange (117 Cal.App.2d 519 [256 P.2d 677]) and should therefore be held to the same standards as the law imposes on the trustee of an express trust (117 Cal.App.2d 519 [256 P.2d 677]). (See also *Clapp* v. *Vatcher,* 9 Cal.App. 462, 466 [99 P. 549]; *Edgar* v. *Bank of America,* 50 Cal.App.2d 827, 833 [123 P.2d 885]; The Fiduciary Principle, 37 C.L.R. 539-555.) It is an elementary principle of the law of trusts that a trustee is forbidden to make use of the trust property for his private or individual purposes or to derive any profit therefrom (Civ. Code, § 2229; *Purdy* v. *Johnson,* 174 Cal. 521, 529 [163 P. 893]; Rest., Trusts, § 205(b); *Crenshaw* v. *Roy C. Seeley Co.,* 129 Cal.App. 627 [19 P.2d 50]; 25 Cal.Jur., § 190, p. 342) and if he does derive profit from such a breach of trust he is liable to the beneficiary therefor (*Estate of Piercy,* 168 Cal. 755 [145 P. 91]; *Burns* v. *Clark,* 133 Cal. 634, 639 [66 P. 12, 85 Am.St.Rep. 233]; *Tobin Grocery Co.* v. *Spry,* 204 Cal. 247 [267 P. 694]; 2 Scott on Trusts, § 170.2, p. 1199; Rest., Trusts, § 205(b); Civ. Code, § 2237). The policy of the law has always been, up until this case, to put fiduciaries beyond the reach of temptation by making it unprofitable for them to yield to it. (*MacIsaac* v. *Pozzo,* 81 Cal.App.2d 278, 285 [183 P.2d 910]; *Miller* v. *McKinnon,* 20 Cal.2d 83 [124 P.2d 34, 140 A.L.R. 570]; *Hoyt* v. *Hampe,* 206 Iowa 206 [214 N.W. 718, 724].) The breach of the fiduciary duty in the case at bar has proved *very* profitable to Company and a majority of this court has placed its stamp of approval thereon.

The rule which *should* be applied here is that stated in the Restatement of Restitution, section 160, Comment (d) : "There are some situations, however, in which a constructive trust is imposed in favor of a plaintiff who has not suffered a loss or who has not suffered a loss as great as the benefit received by the defendant. In these situations the defendant is compelled to surrender the benefit on the ground that he would be unjustly enriched if he were permitted to retain it, even

though that enrichment is not at the expense of the plaintiff. Thus, if the defendant has made a profit through the violation of a duty to the plaintiff to whom he is in a fiduciary relation, he can be compelled to surrender the profit to the plaintiff, although the profit was not made at the expense of the plaintiff.'' The following cases from California* which are in accord with the Restatement rule just set forth must, under the majority holding, be deemed overruled. The majority opinion, however, in totally ignoring the facts, the law of the case, and the far-reaching effects its ill-advised decision will have on one of California's major industries, does not even discuss the law of restitution, and trusts, but holds, simply and without amplification, that the evidence supports the findings! One would never know from reading the majority opinion that any law was involved; one would never know the enormity of the theft committed as the result of the unlawful conduct of the officers of Company which is here judicially sanctioned.

### Special Surplus Fund

In order that the attorneys *and* the people of this state who are interested in the purchase of insurance may understand just exactly what took place in this case, I will set forth the facts relating to the second major issue involved here.

The undisputed evidence in the record shows that under the old underwriters' agreements which were the original agreements between Exchange and Attorney, the Special Surplus Fund was a fund set aside from premiums on policies issued by Exchange and was intended to be used for the expenses of liquidation in the event Exchange was ever liquidated by Attorney in accordance with the terms of the original agreements. There is no dispute that such liquidation has *never* taken place or was even contemplated, as the undisputed evidence shows that Company took over all assets of Exchange as a *going business* and that the Special Surplus Fund was one of the items which Company set up as an asset of Exchange for which Company agreed to pay the subscribers of Exchange the sum of $1,045,159.71. How the trial court determined that

---

*Burns* v. *Clark*, 133 Cal. 634 [66 P. 12, 85 Am.St.Rep. 233]; *Tobin Grocery Co.* v. *Spry*, 204 Cal. 247 [267 P. 694]; *Weiner* v. *Mullaney*, 59 Cal.App.2d 620 [140 P.2d 704]; *Edgar* v. *Bank of America*, 102 Cal. App.2d 700 [228 P.2d 21]; *Lantz* v. *Stribling*, 130 Cal.App.2d 476 [279 P.2d 112]; and see also *Crites, Inc.* v. *Prudential Co.*, 322 U.S. 408, 417 [64 S.Ct. 1075, 88 L.Ed. 1356]; *Magruder* v. *Drury*, 235 U.S. 106, 120 [35 S.Ct. 77, 59 L.Ed. 151]; *Jackson* v. *Smith*, 254 U.S. 586, 588-589 [41 S.Ct. 200, 65 L.Ed. 418].

Company was entitled to retain this Special Surplus Fund is one of the mysteries which the record does not reveal. It was an asset derived from the premiums on policies issued by Exchange and was set aside for a specific purpose for which it was never used, hence it must still be an asset of Exchange. This Special Surplus Fund at the time of the illegal take-over by Company amounted to $592,322.31 and the record shows that it was increased between January 1, 1949, and March 31, 1954, by the accrual of $119,307.37, so that on the last-mentioned date it amounted to the sum of $711,621.68.

The majority holding is, of course, that Company is entitled to this fund. The theory relied on is a marvelous example of utter confusion. First it is said: "... the trial court found that the Special Surplus Fund was, under the Underwriters Agreement,† to be reserved for expenses incurred in connection with *liquidation* and payable to Attorney; that on November 15, 1953, this was assigned to Company as compensation for work heretofore performed in connection with the *liquidation* of Exchange, less such portion as required to reimburse Attorney for future costs of *liquidation*; and that the subscribers have no right or claim to this surplus since it was not a part of Exchange's business or assets." (Emphasis added.) Having quoted the provisions of the superseded underwriters' agreements, the majority then states: "Under the Underwriters Agreement, Attorney-in-Fact was entitled to this fund 'if Exchange discontinues business,' as compensation for winding up the affairs and liquidation. The question then arises whether Exchange has been 'discontinued.' The trial court found that it had, and the evidence supports the finding." It should be carefully borne in mind that this Special Surplus Fund was *derived from investment income of Exchange.* It should also be remembered that the membership of Company and Attorney was identical. It should also be remembered that the District Court of Appeal specifically and unequivocally held that Exchange was *not in liquidation. Under the majority holding, the involuntary discontinuance of business by Exchange because of the machinations of Company must be paid for by Exchange.*

Relying on the illegal and void Transfer and Assumption Agreement the majority quote from its provisions that the Attorney waived its right to the Special Surplus Fund. And even though the Special Surplus Fund was one of the assets of Exchange for which Company contracted (Transfer and

---

†More of this later.

Assumption Agreement) to pay Exchange the sum of $1,-045,159.71, the majority state that "The court found, and the evidence amply supports the finding, that future profits, Attorney fees and the Special Surplus Fund were not items obtained by Company as a consequence of the illegal Transfer and Assumption Agreement." The public is also informed that the subscribers of Exchange "have not suffered either injury or damage" even though they have been cheated out of over a half million dollars. It is held that since the trial court found that Company had not waived its right to this Special Surplus Fund and that since Attorney was originally entitled to it for expenses of liquidation and that Attorney, through the void Transfer and Assumption Agreement had waived its rights thereto, Company was legally entitled to the fund. When the facts are understood it becomes apparent that Attorney's waiver of its rights to the fund is exactly the same as a man transferring his money from his right to his left trouser pocket. The majority opinion does not make clear just how the terms of an agreement declared by the District Court of Appeal to be void and of no effect can be relied on in support of a holding of the superior court. The majority, in an effort to justify its holding, quotes, out of context, a statement made by the District Court of Appeal in its opinion on the first appeal (117 Cal.App.2d 519, 537 [256 P.2d 677]) that "The Company did not at any time in the operation of its business use any funds, facilities or information belonging to, or secured through, the Exchange." In reality the District Court was referring to the situation as it was *prior to* the illegal take-over of Exchange when Company engaged in writing compensation insurance in competition with Exchange.

The majority, in giving everything involved to Company, goes along with Company's argument that it was entitled to the Special Surplus Fund under the old underwriters' agreements which, it contends, were reinstated by the holding of the District Court of Appeal that the Transfer and Assumption Agreement was invalid and void. The underwriters' agreements provided only that Company should use the fund in the event of the *voluntary* discontinuance of business by Exchange. The result to be reached so far as the Special Surplus Fund is concerned *should be*, since Exchange was illegally sold to Company and since it is now too late to set aside the illegal sale, that the subscribers of Exchange should be compensated as nearly as possible for that which they have

lost which includes this fund which constituted their investment earnings. It stands to reason that had the illegal sale not taken place, the Special Surplus Fund would have remained intact. Exchange agrees, although under the circumstances its agreement is a magnanimous one, that Company should be reimbursed for its *actual* expenses in winding up the affairs of Exchange. · But aside from that agreement, Exchange is most definitely entitled to the Special Surplus Fund. (See *Schwarting* v. *Artel,* 40 Cal.App.2d 433, 441 [105 P.2d 380]; *Woods* v. *City Nat. Bank & Trust Co.,* 312 U.S. 262, 269 [61 S.Ct. 493, 85 L.Ed. 820].)

### *Attorney-in-Fact Fees*

This is another major issue involved which the majority opinion glosses over, and again the facts relating thereto will be set forth.

Prior to the execution of the Agreement and *under the old underwriters' agreements* Attorney was entitled to retain 25 per cent of the premium deposits and 5 per cent of dividends as its fee. In consideration of this fee, Attorney was required to pay for all offices, equipment and personnel used for the business of Exchange. Subsequent to January 1, 1949, when the illegal Agreement became effective, Company admits that it handled this business for its own account. The evidence shows that Company had, at the time of retrial, collected *$78,419.13* as fees on dividends and the sum of *$246,331.94* as fees on premiums on the business directly traceable to former Exchange subscribers. Just how, or why, Exchange should be charged with the fees provided for by the old underwriters' agreements after the effective date of the illegal Agreement remains a mystery. After the effective date of the illegal Agreement *by Company's own admission it was acting on its own account and there was no Attorney in existence.* Exchange's recovery should be lessened *only* by the amount of the *actual* costs incurred by Company in conducting the business directly traceable to former Exchange subscribers. To hold otherwise permits Company to profit by its own wrongdoing. There can be no question but that the old underwriters' agreements were superseded by the illegal Agreement; there can also be no question but that the old underwriters' agreements were not revitalized by the District Court of Appeal's holding that the Transfer and Assumption Agreement was illegal, void and of no effect. Company by its conduct after the assumption of Exchange business demonstrated that it was not acting under the old underwriters' agreements. (See

*Pennsylvania Water etc. Co.* v. *Consolidated Gas etc. Co.* [C.A. 4, 1951], 186 F.2d 934, and *Virginia Dare Transp. Co.* v. *Norfolk Southern Bus Corp.* [C.A. 4, 1949], 176 F.2d 354, for cases holding that a judicial declaration of the invalidity of a later contract does not revitalize an original valid contract.)

The findings of the trial court with respect to the fees paid the Attorney-in-Fact are commented on as follows by the majority: "The evidence supporting the foregoing findings is: (a) the Underwriters Agreement; (b) the Transfer and Assumption Agreement; and (c) the agreement whereby Company assumed the obligations of Attorney and Attorney assigned its rights to the management fees." This statement is particularly interesting when it is remembered (1) that the Underwriters' Agreement was superseded by the Transfer and Assumption Agreement which was held to be illegal, void and of no effect, and (3) that the "agreement" between Attorney and Company was an agreement made by one legal entity with itself. I cannot conceive of a majority of this court sanctioning the use of a void and illegal contract as evidence in a case which arose out of that particular void contract. But by its holding here a majority of this court not only judicially sanctions an obvious wrong, but, in effect, allows the wrongdoer to retain both the fruits of his wrong, a bonus for his wrongdoing, and his expenses incident thereto!

### Conclusions

We have this case before us because of the holding of the District Court of Appeal (117 Cal.App.2d 519) that the Agreement was illegal, void and of no effect because it was in violation of section 1101 of the Insurance Code. Section 1106 of the same code makes any violation of section 1101 a misdemeanor. The District Court of Appeal held that the Agreement, since it was made contrary to the terms of a law designed for the protection of the public and which prescribed a penalty for its violation, was illegal, void and of no effect.

There can be no question but that the same rule of law should be applied here as this court, speaking through Mr. Justice Shenk, applied in the case of *Contractor's etc. Assn.* v. *California Comp. Ins. Co.*, 48 Cal.2d 71, 76 [307 P.2d 626], and which was a unanimous decision. It was there held: "Acceptance or receipt of an unlawful rebate is a misdemeanor. (Ins. Code, § 752.) Violation of the minimum rating law is also a misdemeanor. (Ins. Code, § 11742.) This court said in

*Severance* v. *Knight-Counihan Co.*, 29 Cal.2d 561 (*supra*), at page 568: 'It is settled that a contract must have a lawful object (Civ. Code, §§ 1596, 1598, 1599) and that a contract for an object prohibited by a penal law is void. . . . "The general rule controlling in cases of this character is that where a statute prohibits or attaches a penalty to the doing of an act, the act is void, and this, notwithstanding that the statute does not expressly pronounce it so, and it is immaterial whether the thing forbidden is *malum in se* or merely *malum prohibitum.* . . . The imposition by statute of a penalty implies a prohibition of the act to which the penalty is attached, and a contract founded upon such act is void." ' " Applying the foregoing rule to the facts of the case at bar, we have a situation where Company by means of a contract "having an object prohibited by a penal law" acquired the property and assets of Exchange. That contract was illegal and void because the act of entering into it constituted a crime. Such being the case the subscribers of Exchange should have the right to recover everything of value which Company acquired under such illegal and void contract together with the increment thereof.

The judgment in this case should, in the interest of justice, be reversed with directions to the trial court which cannot be misunderstood. Such directions should encompass all the issues raised and should be for an accounting to determine:

1. The net profits made by Company from business directly traceable to former Exchange business. The trial court should retain jurisdiction so that the net profits accruing from year to year which are directly traceable to Exchange business may be judicially ascertained and awarded to Exchange subscribers;

2. The Special Surplus Fund comprising the investment earnings of Exchange *prior* to its illegal take-over by Company and amounting at the time of trial to the sum of $711,769.68 should be awarded to Exchange subscribers together with the increment thereof.

3. The Attorney-in-Fact fees, amounting to the sum of $324,751.07, at the time of retrial, should be awarded to Exchange subscribers. The direction to the trial court to ascertain the *net* profits attributable to Exchange business would allow Company its actual expenses in conducting the business directly traceable to former Exchange subscribers.

I agree that the awarding of, or refusal to award, interest on unliquidated amounts is a matter generally held to be

discretionary with the trial court (*Title Ins. & Trust Co.* v. *Ingersoll*, 158 Cal. 474 [111 P. 360]; *Wheeler* v. *Bolton*, 92 Cal. 159 [28 P. 558]; *Leonard* v. *Huston*, 122 Cal.App.2d 541 [265 P.2d 566]; *Stockton Theatres, Inc.* v. *Palermo*, 121 Cal.App.2d 616 [264 P.2d 74]).

I agree that appellant Johnson is a mere intervener in the stockholders' derivative action and that it may not participate in the presentation of the main case except as counsel for the main stockholders may consent or the court may permit. It appears here that appellant Johnson's rights were fully protected by counsel for the main stockholders (*Mann* v. *Superior Court*, 53 Cal.App.2d 272, 280 [127 P.2d 970]).

For the reasons heretofore set forth it should be clear to every thinking person that the judgment should be reversed with clear directions to the trial court for its guidance on the retrial.

The petition of defendants and appellants for a rehearing was denied November 26, 1957. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.